STATE OF NORTH CAROLINA v. CHARLES TIMOTHY MATHIS AND BARAK ELLIOT WILLIAMSON

No. 10PA98

(Filed 31 December 1998)

**1. Arrest and Bail § 199 (NCI4th)— arrest of principal— authority of bondsmen**

Although the common law of North Carolina has always recognized the sweeping powers of sureties, or bail bondsmen acting as their agents, to apprehend the principal and use whatever force is reasonably necessary in the process, the arrest provisions of N.C.G.S. § 58-71-30 do not create a law enforcement officer in the person of the bail bondsman.

STATE v. MATHIS

[349 N.C. 503 (1998)]

**2. Arrest and Bail § 199 (NCI4th)— arrest of principal— authority of bondsman—home of third party**

While the contract between a surety and principal authorizes a surety to exercise certain powers as to the principal, this contractual authority cannot be extended to cases where a surety is seeking the principal in the home of a third party where the principal does not preside. However, when the principal himself resides in the home of a third party, the bond agreements giving the principal's consent for the sureties or their agents to break and enter his residence authorize them to enter.

**3. Arrest and Bail § 199 (NCI4th)— arrest of principal— authority of bondsman—use of force**

Sureties or their agents may use such force as is reasonably necessary to overcome the resistance of a third party who attempts to impede their privileged capture of their principal, but only such force as is reasonably necessary under the circumstances to accomplish the arrest.

**4. Arrest and Bail § 199 (NCI4th)— assault and breaking or entering—prosecution of bail bondsman—authority of bondsman—instructions**

The trial court erred in the prosecution of two bail bondsmen for assault and breaking or entering during an arrest by not instructing the jury concerning the common law and statutory authority of sureties and their agents to search for and seize their principal. A jury could find from the evidence here that the bondsmen had a reasonable belief that the principal was in his residence, that the owner of the residence was interfering with the arrest, and that the bondsmen were justified in using the force necessary to enter and seize the principal. Where competent evidence is introduced tending to show a surety or his agent acted as a matter of right pursuant to lawful authority, it is a substantial and essential feature of the case about which the court is required to properly instruct the jury.

Justice WYNN did not participant in the consideration or decision of this case.

Justice FRYE concurring in part and dissenting in part.

Justice WHICHARD joins in this concurring and dissenting opinion.

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review the decision of the Court of Appeals, 126 N.C. App. 688, 486 S.E.2d. 475 (1997), reversing judgments entered by Davis (James C.), J., on 7 June 1996 in Superior Court, Cabarrus County, and remanding for a new trial. Heard in the Supreme Court 28 May 1998.

*Michael F. Easley, Attorney General, by Ellen B. Scouten, Special Deputy Attorney General, for the State-appellant.*

*Aaron E. Michel for defendant-appellees.*

MITCHELL, Chief Justice.

The questions presented for review by the State's petition for writ of certiorari involve whether the Court of Appeals, in ordering a new trial, improperly construed the common law powers of bail bondsmen to allow them to break into a residence and use force against a third party when searching for their principal. For the reasons that follow, we affirm the decision of the Court of Appeals.

Defendants Charles Timothy Mathis and Barak Elliot Williamson were charged with misdemeanor breaking and entering. Mathis was also charged with misdemeanor assault on a female and misdemeanor injury to real property. They were tried and found guilty on 18 January 1996 in District Court, Cabarrus County. Defendants appealed to the Superior Court.

Defendants, appearing *pro se,* were tried *de novo* at the 3 June 1996 Civil Session of Superior Court, Cabarrus County. Evidence at trial tended to show the following. On 21 April 1995, William Tankersley, III, signed a bail bond in the amount of $1,500 with Marie's Bail Bonding Company to secure his release upon the charge of passing worthless checks. After Mr. Tankersley failed to appear in court, a warrant was issued for his arrest, and the bond was ordered forfeited.

Defendants Mathis and Willamson, licensed bail bondsmen, were employed by Marie's Bail Bonding. On 9 December 1995, defendants received a call from their employer telling them to find and apprehend Mr. Tankersley and surrender him to the Mecklenburg County Sheriff. Defendants went first to 1700 The Plaza in Charlotte, the residence of Ms. Joanne McKnight, Mr. Tankersley's sister-in-law. Not finding Mr. Tankersley there, they proceeded to his residence.

Mr. Tankersley resided at his mother's house at 8 Willowbrook Drive, Concord, North Carolina, together with his mother Mrs. Susan

Nelson, her husband, Mr. Tankersley's sister Ms. Noto, and Ms. Noto's three children. Both Mrs. Nelson and Ms. Noto had dealt with Marie's Bail Bonding before. Ms. Noto had cosigned the bond on this occasion. The bond papers showed that Mr. Tankersley drove a white 1990 Mazda MX-6 and Mrs. Nelson drove a blue 1990 Toyota Camry.

Upon defendants' arrival at the residence, Ms. Noto told defendants that Mr. Tankersley was not home and that he had gone shopping with his mother in the white Mazda. Defendant Mathis testified that when he asked Ms. Noto if Ms. McKnight had called her, she answered "no," but she said that Ms. McKnight had spoken to Mr. Tankersley just before he left the house. After waiting outside the residence and watching it for two hours, defendants were relieved by another bail bondsman. At 6:47 p.m., defendant Mathis received a call indicating that Mr. Tankersley had entered the house.

Defendants drove back to Concord to Mr. Tankersley's residence where they observed the white Mazda parked outside the house. Defendant Mathis went to the back door of the house and knocked. Mrs. Nelson came to the door, stepped outside, and closed the glass storm door behind her. Defendant Mathis testified that he then identified himself, showed Mrs. Nelson his bail bondsman's license, and told her he was there to arrest her son.

Mrs. Nelson told defendant Mathis that her son was not at home and refused to allow him to enter. Mathis told her that he knew her son was there because his car was in the driveway. Mrs. Nelson said that the white Mazda was not her son's car and that he no longer used it. Defendant told Mrs. Nelson that if it would make her feel better, she could call the police and that he was "going to come in there . . . . I have a warrant, and I'm going to leave when I get my man."

Mrs. Nelson blocked the door, persisting in her refusal to allow defendant Mathis to enter. He testified that as he slowly opened the storm door, Mrs. Nelson began striking him about the chest and shoulders, yelling loudly. He then pushed the storm door against Mrs. Nelson, pinning her against the exterior wall of the house. As defendant Mathis pushed the door in one direction, Mrs. Nelson pushed in the other direction, which caused the clips holding the glass panel in place to pop out, damaging the door.

While defendant Mathis held the storm door, defendant Willamson entered the house. At this point, defendant Mathis released the storm door and also entered the house. They were followed by Mrs. Nelson, who then called the police. Defendant

STATE v. MATHIS

[349 N.C. 503 (1998)]

Williamson proceeded to search the rooms in the house but did not enter a locked front bedroom because Mr. Nelson told him a baby was asleep inside.

After arriving on the scene, the police asked defendants to step outside and told them that they would notify them when the arrest was made. At 2:00 a.m., having not received the call, defendants went back to Mr. Tankersley's residence. After they saw the white Mazda in the driveway, defendants flagged down a police officer who helped them take Mr. Tankersley into custody.

At the conclusion of the evidence, the trial court conducted a jury charge conference. At that time, defendants requested that the trial court include in its final instructions to the jury instructions defining the authority of bail bondsmen to break and enter the home of a principal and to use such force as reasonably necessary to apprehend him. The trial court denied this request.

At the conclusion of the trial court's final instructions to the jury, the trial court asked if the State or defendants wished to have any additional instructions given. Defendants again requested that appropriate instructions be given regarding the authority of bail bondsmen and made specific requests that the trial court read portions of certain opinions of this Court defining that authority as it related to the evidence presented at trial. The trial court again denied defendants' requests. Defendants were found guilty of all charges.

Defendants appealed to the North Carolina Court of Appeals. In a unanimous opinion, the Court of Appeals reversed the convictions and remanded defendants' cases for a new trial, concluding that the trial court had erred "by failing to instruct the jury on the common law and statutory authority of bail bondsmen to break and enter a principal's home to accomplish a lawful arrest." *State v. Mathis*, 126 N.C. App. 688, 693, 486 S.E.2d 475, 478 (1997). The Court of Appeals also concluded that the jury should have been instructed regarding the privilege of bail bondsmen to use reasonable force and the prohibition against their use of excessive force when apprehending their principal.

This Court granted the State's petition for certiorari on 5 February 1998. In analyzing the authority granted bail bondsmen, two issues are before us: (1) whether a bail bondsman may forcibly enter his principal's residence to search for and seize him; and (2) whether, in the process of gaining entry, a bail bondsman may overcome the

resistance of a third party. We conclude that bail bondsmen have both such powers under the common law. Therefore, we answer both of these questions in the affirmative.

We begin our discussion with a brief overview of the history of the American system of bail,[1] which is rooted in the English common law. Jonathan Drimmer, *When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System*, 33 Hous. L. Rev. 731, 744 (1996) [hereinafter *When Man Hunts Man*]. Release on bail pending trial developed from "an ancient and extremely vigorous form of suretyship or hostageship, which rendered the surety liable to suffer the punishment that was hanging over the head of the released prisoner." 2 Sir Frederick Pollack & Frederic William Maitland, *The History of English Law* 589 (2d ed. 1959). The surety was, in effect, "bound body for body" with the principal. *Id.* at 590.

The now-common practice of allowing the surety to pay a sum of money should the accused not appear for trial was first utilized in the early thirteenth century.[2] By releasing the prisoner into the custody of the surety, not only was the return of the prisoner assured, but also, and importantly, his release strengthened the presumption of innocence fundamental to our system of justice. *Stack v. Boyle*, 342 U.S. 1, 4, 96 L. Ed. 3, 6 (1951). Freedom of the accused protected him from the punishment of pretrial detention and also improved his opportunity to prepare a defense. *Id.* The release of the prisoner has always been considered a form of continued detention, and the common law viewed the surety's custody as a single, continuous event. " 'A man's bail are looked upon as his jailers *of his own choosing*, and the person bailed is, in the eye of the law, for many purposes, esteemed to be as much in the prison of the court by which he is bailed, as if he were in the actual custody of the proper jailer.' " Annotation, *Surrender of Principal by Sureties on Bail Bond*, 3 A.L.R. 180, 183 (1919) (quoting II William Hawkins, *Pleas of the Crown* 138, 138-39 (8th ed. 1824)) (emphasis added).

---

1. The popular meaning of "bail" is the security given for the appearance of the accused to obtain his release from prison. The person who posts the required amount of bail is generally called the "surety" and in earlier cases simply "bail." The "principal" is the person who has been arrested and is released on bond pending his scheduled court appearance. 8A Am. Jur. 2d *Bail & Recognizance* § 1 (1997).

2. In earlier times, the surety was typically an acquaintance of the accused, a property owner, and a reputable member of the community. If the principal failed to appear at trial, the surety would quite often have to forfeit his real property. *When Man Hunts Man*, 33 Hous. L. Rev. at 745.

## STATE v. MATHIS

[349 N.C. 503 (1998)]

Similarly, no distinction was made between a law enforcement officer's recapture of an escaped prisoner and a surety's apprehension of his principal; neither was considered an original taking. *Commonwealth v. Brickett*, 25 Mass. (8 Pick.) 138, 141 (1829). The surety was granted the same rights and powers as a sheriff capturing an escaped prisoner and returning him to the proper authorities. Because the principal was never out of the "custody" of the surety, the surety could take him at any time, "when and where he pleases." *Read v. Case*, 4 Conn. 166, 170 (1822).

The United States Constitution recognized the need for bail in our system of justice by requiring that "[e]xcessive bail shall not be required." U.S. Const. amend. VIII. In doing so, the English common law system of bail was adopted. However, due to rapid urbanization and the weakening of close community ties which resulted, by the mid-nineteenth century the personal-surety system of bail utilized for centuries was no longer practical, and the modern-day system of relying on commercial bondsmen[3] evolved. *When Man Hunts Man*, 33 Hous. L. Rev. at 749. Today's commercial bondsmen have retained the same broad common law powers sureties have always enjoyed regarding the custody, control, and recapture of the principal.

In the most often quoted case in this area of the law, *Taylor v. Taintor*, 83 U.S. 366, 21 L. Ed. 287 (1872), the United States Supreme Court defined the rights and powers of sureties and bail bondsmen at common law:

> When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuation of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge, and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State, may arrest him on the Sabbath, and if necessary, may break and enter his house for that purpose. The seizure is not made by virtue of new process. None is needed. It

---

3. The bail procedure operates as follows: A relative or friend will contact a bail bondsman, who decides on the basis of the accused's background, criminal record, and community ties whether he is a good risk. If the bondsman decides he will write the bond, he charges a fee, typically ten percent of the full bail amount paid, and presents the court with a bail bond securing release of the defendant, or "principal." If the principal fails to appear for trial as scheduled, the bondsman is responsible for the entire financial obligation. Michael Goldstein, *The Hunters and the Hunted: Rights and Liabilities of Bailbondsmen*, 6 Fordham Urb. L.J. 333, 333 n.2 (1978).

is likened to the rearrest by the sheriff of an escaping prisoner. In 6 Modern [231], it is said: "The bail have their principal on a string, and may pull the string whenever they please and render him in their discharge."

*Id.* at 371-72, 21 L. Ed. at 290. This decision established the law of the land to be applied in federal courts. *In re Von Der Ahe,* 85 F. 959, 962 (W.D. Pa. 1898).

The comprehensive powers of the bondsman recognized in *Taintor* are based on the underlying source of the bondsman's authority to recapture the principal which derives from the contractual relationship between the surety and the principal. Essentially, the bond agreement provides that the surety post the bail, and in return, the principal agrees that the surety can retake him at any time, even before forfeiture of the bond. By entering into the contract, not only does the principal *voluntarily* consent to be committed to the custody of the surety, but under common law, he also implicitly agrees that the surety or the surety's agent may break and enter his home and use reasonable force in apprehending him. *Id.* at 960. Further, the contract establishes the surety's and bondsman's right of recapture as private in nature, with the understanding that the government will not interfere. *Reese v. United States,* 76 U.S. 13, 22, 19 L. Ed. 541, 544 (1869). Thus, this common law right of recapture established that the seizure of the principal by the surety is technically not an "arrest" at all and may be accomplished without process of law.

We think it important to note here that while most statutory and decisional authorities use the term "arrest" when referring to the recapture of the principal, in this area of the law, that term is not used in the traditional way to mean to "deprive another of his liberty" or "to take custody of." Since the principal is always in the "custody" of the surety, his apprehension by the surety or his agent is merely a "continuation of the original imprisonment." The term "arrest" in the context involved here is meant to convey an "apprehension," "seizure," or "recapture." As the court in *Von Der Ahe* stated in holding that the private contract between the principal and the surety implicitly authorized the surety to seize the principal at any time,

there is a fundamental difference between the right of arrest by bail and arrest under warrant where such right to arrest is based upon a court process . . . . The latter right depends upon the process of the court . . . . The former arrest . . . is based

upon the relationship which the parties have established between themselves . . . .

*Von Der Ahe*, 85 F. at 960; *see Fitzpatrick v. Williams*, 46 F.2d 40, 40 (5th Cir. 1931) ("The right of the surety to recapture his principal is not a matter of criminal procedure, but arises from the private undertaking implied in the furnishing of the bail bond. It is not the right of the state but of the surety."); *Nicolls v. Ingersoll*, 7 Johns. 145, 154 (N.Y. 1810) ("[T]his shows that the jurisdiction of the court in no way controls the authority of the bail; and as little can the jurisdiction of the State affect this right, as between the bail and his principal."); *see also State v. Nugent*, 199 Conn. 537, 508 A.2d 728 (1986); *State v. Perry*, 50 N.C. App. 540, 274 S.E.2d 261, *appeal dismissed*, 302 N.C. 632, 280 S.E.2d 446 (1981). Absent the involvement of the State, the constitutional protections of due process are not implicated.

It has long been settled common law that the surety may use reasonable force to apprehend the principal and may even forcibly enter the principal's residence. "His dwelling is no longer his castle as against the right of the sureties, but may be entered at any time of day or night, and on a Sunday as well as on a week day." *United States v. Keiver*, 56 F. 422, 426 (W.D. Wis. 1893); *see also Brickett*, 25 Mass. (8 Pick.) at 140 ("If the door should not be opened on demand at midnight, the bail may break it down, and take the principal from his bed, if that measure should be necessary . . . ."); *Nicolls*, 7 Johns. at 155 (the bail is entitled to break the outer door of a dwelling to enter the premises where the principal is). Since the nineteenth century, the common law principles granting sureties and their agents power and authority have been modified very little, if at all. Courts throughout the country have upheld the decisions of the earlier cases, confirming the role of the bondsman in the pretrial process. Numerous cases have reemphasized that the surety and his agents have a right to arrest the principal without a warrant, pursue him across state lines, return him to the home state without extradition proceedings, and use other means necessary to achieve the goal of apprehending the principal. *E.g., Fitzpatrick*, 46 F.2d at 41; *Smith v. Rosenbaum*, 333 F. Supp. 35, 39 (E.D. Pa. 1971), *aff'd*, 460 F.2d 1019 (3d Cir. 1972); *Curtis v. Peerless Ins. Co.*, 299 F. Supp. 429, 435 (D. Minn. 1969); *Thomas v. Miller*, 282 F. Supp. 571, 573 (E.D. Tenn. 1968); *McCaleb v. Peerless Ins. Co.*, 250 F. Supp. 512, 515 (D. Neb. 1965).

[1] We turn now to an analysis of the applicable law of North Carolina.

[T]he "common law" to be applied in North Carolina is the common law of England to the extent it was in force and use within this State at the time of the Declaration of Independence; is not otherwise contrary to the independence of this State or the form of government established therefor; and is not abrogated, repealed, or obsolete. N.C.G.S. § 4-1.

*Gwathmey v. State ex rel. Dep't of Env't, Health & Natural Resources*, 342 N.C. 287, 296, 464 S.E.2d 674, 679 (1995). The common law of North Carolina has always recognized the sweeping powers of sureties, or bail bondsmen who act as their agents, to apprehend the principal and use whatever force is reasonably necessary in the process. *State v. Lingerfelt*, 109 N.C. 775, 14 S.E. 75 (1891). "At common law, when bail was given, and the principal relieved from the custody of the law, he was regarded, not as freed entirely, but as transferred to the friendly custody of his bail. They had a dominion over him, and it was their right at any time to arrest and surrender him again to the custody of the law, in discharge of their obligation." *State v. Schenck*, 138 N.C. 560, 561, 49 S.E. 917, 917-18 (1905). "Persons who become bail are favored by the law, and the powers given the bail over his principal are given to enable him more easily to perform the onerous duties and obligations which he has voluntarily assumed." *Pickelsimer v. Glazener*, 173 N.C. 630, 640, 92 S.E. 700, 705 (1917).

We also note that the authority of the surety, or a bondsman acting as his agent, to apprehend and surrender the principal in accord with the common law principles set out above also finds support in statutory authority:

For the purposes of surrendering the defendant, the surety may arrest him before the forfeiture of the undertaking, or by his written authority endorsed on a certified copy of the undertaking, may request any judicial officer to order arrest of the defendant.

N.C.G.S. § 58-71-30 (1994).

(a) A surety may surrender his principal to the sheriff of the county in which the principal is bonded to appear or to the sheriff where the defendant was bonded. A surety may arrest his principal for the purpose of returning him to the sheriff. Upon surrender of the principal the sheriff must provide a receipt to the surety, a copy of which must be filed with the clerk.

N.C.G.S. § 15A-540 (1997). This statutory right of arrest granted the surety does not change—but simply codifies a part of—the common law powers of sureties that have always been recognized in our state. *State v. Perry*, 50 N.C. App. 540, 274 S.E.2d 261 (decided under former N.C.G.S. § 85C-7). The arrest provisions of N.C.G.S. § 58-71-30 do not create a law enforcement officer in the person of the bail bondsman. *Id.* at 542, 274 S.E.2d at 262. "Neither do we conclude that the bondsman's right to request that a judicial officer order the arrest of a defendant creates a law enforcement officer in the person of the bail bondsman." *Id.* Interestingly, N.C.G.S. § 58-71-105 prohibits law enforcement officers from becoming sureties on a bail bond.

**[2]** While we acknowledge that the contract between the surety and the principal authorizes the surety to exercise certain powers as to the principal, we do not find that this contractual authority can be extended to cases where a surety is seeking the principal in the home of a third party *where the principal does not reside.* In those cases the surety must first have the consent of the homeowner to enter the premises and conduct a search. *See State v. Tapia*, 468 N.W.2d 342 (Minn. Ct. App. 1991).

At least one court appears to have indicated that a surety may enter the home of a third party where the principal does not reside even *without* consent of the owner if (1) the surety identifies himself and makes his intention known, (2) the surety actually sees the principal in the house, and (3) the surety acts in a reasonable manner in gaining entry. *Livingston v. Browder*, 51 Ala. App. 366, 370, 285 So. 2d 923, 927 (1973). We do not agree with this analysis. The right of the surety to enter the residence of his principal and to seize him arises as a matter of contract from the bond agreement which carries with it the principal's implied consent that the surety may seize him at any time and may use such force as is reasonably necessary to enter his residence at any time in order to do so. The principal has no authority to authorize the surety, by contract or otherwise, to enter the residence of a third party in which the principal does not himself reside. Therefore, the surety obtains no such power by virtue of the bond agreement.

When the principal himself resides in the home of a third party, however, a different rule applies. There is "no difference between a house of which [the principal] is solely possessed, and a house in which he resides by the consent of another." *Sheers v. Brooks*, 126 Eng. Rep. 463, 464 (1792); *see* also *Nicolls*, 7 Johns. at 155. Bond agreements giving, as a matter of law, the principal's consent for the

sureties or their agents to break and enter his residence authorize them to enter even when the principal resides there with others. *Nicolls; see Mease v. State,* 165 Ga. App. 746, 302 S.E.2d 429 (1983).

[3] This brings us to the final question of whether sureties or their agents may lawfully overcome the resistance of a third party who is impeding their apprehension of the principal. Although we have found no North Carolina case directly on point, it is generally recognized that

> [w]here the third person knowingly causes the arrestor to believe that he or she is intentionally impeding the privileged arrest or recapture of a suspect or is attempting to rescue or assist the suspect in resisting arrest or escaping therefrom, the arrestor is privileged to use such force against the third person as he or she would be privileged to use against one who resisted or attempted escape.

5 Am. Jur. 2d *Arrest* § 116 (1995). Therefore, we conclude that sureties or their agents may use such force as is reasonably necessary to overcome the resistance of a third party who attempts to impede their privileged capture of their principal. But they may use only such force as is reasonably necessary under the circumstances to accomplish the arrest.

[4] We now apply the foregoing principles of law to the case before us. The State contends that the trial court was not required to instruct the jury concerning the common law and statutory authority of sureties and their agents to search for and seize their principal. Therefore, the State argues that the Court of Appeals erred in reversing the trial court and remanding for defendants to receive a new trial. We do not agree.

When instructing the jury, the trial court has the duty to declare and explain the law arising on the evidence. Where competent evidence is introduced tending to show that a surety or his agent acted as a matter of right pursuant to lawful authority, it is a substantial and essential feature of the case about which the trial court is required to properly instruct the jury. *Lingerfelt,* 109 N.C. 775, 14 S.E. 75; *see State v. Morgan,* 315 N.C. 626, 643, 340 S.E.2d 84, 95 (1986).

In the present case, evidence tended to show that defendants were licensed bail bondsmen employed by Marie's Bail Bonding, which issued Mr. Tankersley's bond. Mr. Tankersley testified that 8

Willowbrook Drive was his residence, and that is where he was later arrested. Furthermore, Mrs. Nelson testified that he resided in the house with her. Ms. Noto and Ms. McKnight also testified that he lived at the house. This was sufficient evidence to permit a properly instructed jury to find that the house was, in fact, Mr. Tankersley's residence.

As we have explained in detail above, the surety or a bondsman acting as his agent has the authority and the contractual right to break and enter the *principal's* residence and to use the force reasonably necessary to apprehend him. Therefore, a properly instructed jury could find that when Mr. Tankersley failed to appear in court according to the terms of his bail bond, defendants were exercising their common law rights as bondsmen to break and enter his residence at 8 Willowbrook Drive to seize him.

Again, we stress that although evidence suggested that Mrs. Nelson was the owner of the home, this alone would not create a case of violation of a third party's privacy rights. Evidence tended to show that Mr. Tankersley also was a resident there. Even a warrantless search by a police officer may be consented to by a common resident or cotenant who possesses common authority or other sufficient relationship to the premises, regardless of the fact that the property may contain evidence incriminating another person. 68 Am. Jur. 2d *Searches and Seizures* § 92 (1993). A surety enters pursuant to the consent of his principal, which is valid if the principal is a common resident in the premises. *See Mease v. State*, 165 Ga. App. 746, 302 S.E.2d 429 (1983) (Two bondsmen went looking for their principal at the house where she lived with someone else. After being told by the other occupant of the house that she was not there, and without consent, the bondsmen entered the residence and searched for the principal. The defendants in that case were found not guilty of criminal trespass because the court found that the evidence did not support a finding that they had entered the house for an "unlawful purpose."). Here, there was evidence that 8 Willowbrook Drive was Mr. Tankersley's residence. Therefore, a properly instructed jury could find that defendants had the authority and a legitimate right to enter and to search for Mr. Tankersley inside the house at 8 Willowbrook Drive.

Furthermore, evidence was introduced from which a jury could find that defendants had a reasonable belief that Mr. Tankersley was inside his residence. Evidence tended to show that defendants were notified by another bondsman watching the residence that Mr.

Tankersley had come home. Upon arriving at the house, defendants noticed the white Mazda parked in the driveway; the Mazda had not been there earlier, and Mr. Tankersley had indicated on the bond application that it was the car he drove. Mrs. Nelson made quite an effort to keep defendants out of the house. There was also evidence of a locked bedroom to which defendants were denied access because they were told a sleeping baby was inside. From such evidence, a jury could find that defendants were within the limits of their powers as bondsmen in conducting a search of the residence.

As to the reasonableness of defendant Mathis' actions, we note that upon encountering Mrs. Nelson in the residence of the principal, Mathis was met with some resistance. Evidence tended to show that when he identified himself and stated his intentions, Mrs. Nelson denied him entry and blocked the door. According to the testimony of defendant Mathis, she began striking him about the chest and shoulders. Pushing the door against her, Mathis forced his way in. Mrs. Nelson testified that she was not injured.

We are not suggesting that there are no limits to a bondsman's powers. However, a jury could find from such evidence that the bondsmen here had a reasonable belief that Mr. Tankersley was in his residence, that Mrs. Nelson was interfering with the arrest, and that the bondsmen were justified in using the force necessary to enter and seize Mr. Tankersley.

For the foregoing reasons, we conclude that the trial court should have instructed the jury on the common law and statutory authority of bail bondsmen. The decision of the Court of Appeals to reverse the judgment of the Superior Court and remand for a new trial due to the trial court's failure to give such instructions is therefore affirmed.

AFFIRMED.

Justice WYNN did not participate in the consideration or decision of this case.

Justice FRYE concurring in part and dissenting in part.

In this opinion, the majority concedes that the right of a surety to seize his or her principal is not absolute. In fact, the majority emphasizes that a surety has no authority to enter the residence of a third party in which the principal does not himself reside in order to retake the principal. However, the majority holds that if the principal him-

self resides in the home of a third party, the surety is authorized to break and enter the home to search for and apprehend the principal. While I have reservations regarding this holding, the weight of authority supports the majority opinion on this issue. Thus, I concur with the majority that defendants were entitled to appropriate instructions on the charges of breaking and entering and injury to real property.

However, the majority also holds that "sureties or their agents may use such force as is reasonably necessary to overcome the resistance of a third party who attempts to impede their privileged capture of their principal." For the following reasons, I disagree with this statement, and therefore, I respectfully dissent from that portion of the majority opinion which holds that the jury should have been so instructed as to the charge of assault.

The issue of the use of force by sureties and bondsmen is one of first impression for this Court. The majority cites *State v. Lingerfelt*, 109 N.C. 775, 14 S.E. 75 (1891), for the proposition that the common law of North Carolina "has always recognized the sweeping powers of sureties, or bail bondsmen who act as their agents, to apprehend the principal and use whatever force is reasonably necessary in the process." However, the sole issue addressed by the Court in *Lingerfelt* was whether the defendants had the right to arrest their principal. *Id.* at 776, 14 S.E. at 76. In *Lingerfelt*, the Court did not decide or remark on the issue of the use of force by a surety, and to the extent that the facts of that case suggest anything about the use of force, it is that the defendants had the right to defend against the violent resistance of their principal.

In this case, the majority states that "the contract between the surety and the principal authorizes the surety to exercise certain powers as to the principal." I agree. As the majority explains, it is by virtue of this consent that the surety has the right to enter the principal's residence to search for and apprehend him, even in cases where the principal shares the residence of others. However, the majority then summarily concludes that "sureties or their agents may use such force as is reasonably necessary to overcome the resistance of a third party who attempts to impede their privileged capture of their principal," citing only secondary authority on the law of arrests. I strongly disagree with this conclusion.

The source of a surety's power is the contractual agreement by which the surety guarantees the principal's bail and the principal

STATE v. MATHIS

[349 N.C. 503 (1998)]

agrees to submit to the "custody" of his surety. As the majority notes, the surety's and bondsman's right to "arrest" the principal is the right to apprehend, seize, or recapture the principal. It is from this right that the surety or his agent gains the implied right to use reasonably necessary force *against the principal* to effect his recapture. Without this implied right to use force against the principal, the right to seize or apprehend would be meaningless in the face of resistance. However, the majority makes an unsupported leap from this implied right to use force against the principal to the conclusion that the surety or bondsman is therefore privileged to use force against a third party to effect a seizure of the principal. If the right of the surety to retake his principal arises from a private contract, there is no basis for the surety, or bondsman acting as his agent, to interfere with the rights of any third party. The principal cannot consent to the breaking and entering of another's home where he does not reside, nor can he consent to the use of force against one who is not a party to the agreement.

In this case, Mr. Tankersley's implied consent, by virtue of the bond contract, gave defendants the right to break and enter his residence to search for him. However, Tankersley could not consent to defendants' use of force against Mrs. Nelson or anyone else in the course of exercising that right. No principal may give consent to a surety to assault a third party. *See State v. Portnoy*, 43 Wash. App. 455, 466, 718 P.2d 805, 811 (dismissing the defendant's argument, the court stated that "Portnoy offers no authority for the proposition that the bondsman may sweep from his path all third parties who he thinks are blocking his search for his client, without liability to the criminal law"), *review denied*, 106 Wash. 2d 1013 (1986).

Furthermore, as the majority correctly notes, a bail bondsman is not a law enforcement officer. Thus, the right of a surety or bondsman to use force to effect a seizure of the principal is not the same as the right of a law enforcement officer to use force in making a criminal arrest. By statute in North Carolina, police officers have been given the authority to use reasonable force in an arrest situation against a third person or against the person being arrested. N.C.G.S. § 15A-401(d) (1997). Private citizens may assist in or effect an arrest, and thus become privileged to use reasonable force, only when specifically requested to do so by law enforcement officers. N.C.G.S. § 15A-405 (1997). A surety or bail bondsman has no greater general power of arrest than any other private citizen. While sureties are given specific statutory authority to "arrest" their principal, N.C.G.S.

§ 58-71-30 (1994), the General Statutes contain no express authority for the surety to use force to do so.

The majority, while distinguishing the term "arrest" as used in the context of surety and principal from its traditional meaning as used in the criminal law, nonetheless relies on the general law of arrest applicable to peace officers and private citizens to justify the right of the surety to use force to overcome the resistance of a third party in the course of apprehending a principal. As noted above, however, the power of sureties or bondsmen to arrest their principal is specifically granted by statute and is not the same as the power of arrest given to those acting in a law enforcement capacity. Therefore, the law of arrest, as stated by 5 Am. Jur. 2d *Arrest* § 116 (1995) and quoted by the majority, is simply inapplicable to this situation.[1]

This Court should not recognize a right of bail bondsmen to use force against third parties where none is expressly given by statute. To do so is to invite breaches of the peace and needless injury. It is for this reason that the common law power of a citizen to arrest has been abrogated and is now wholly defined by statute. *See* N.C.G.S. § 15A-404 (1997) (allowing detention only, as opposed to arrest; official commentary states that "[t]he notion of a private citizen 'arresting' another . . . had led persons at times to act without authority and at times to place themselves or others in unjustified danger."); *State v. Mobley*, 240 N.C. 476, 83 S.E.2d 100 (1954) (noting that the power of arrest without warrant is entirely defined and limited by statute). Prohibiting bondsmen from using force against third parties will not deprive them of the seizure of their principal. Such a rule merely requires a surety or bondsman to obtain the assistance of law enforcement rather than resort to self-help measures against third parties. As the facts of this case show, defendants ultimately did find it necessary to seek the assistance of law enforcement officers to apprehend Mr. Tankersley.

In summary, I agree with the majority's conclusion that defendants were entitled to jury instructions defining the authority of bail bondsmen to break and enter the home of their principal. For the above-stated reasons, however, I do not believe that defendant Mathis was entitled to an instruction that says a bondsman may use force to overcome the resistance of a third party in order to

---

1. In fact, the introduction to the article cited by the majority notes that the topic of the power of bail bond sureties to arrest their principal is treated elsewhere. See 8A Am. Jur. 2d *Bail and Recognizance* (1997) for specific treatment.

gain entry. Therefore, I would hold that defendants are entitled to a new trial only on the charges of breaking and entering and injury to property.

Justice WHICHARD joins in this concurring and dissenting opinion.