IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| RON APPLEGATE, an individual together with his marital community, | No. 74739-8-I |
| Appellant, | DIVISION ONE |
| v. | |
| LUCKY BAIL BONDS, INC.; GREG D. PETERSON and his marital community; CESAR LUNA, and his marital community; RILEY WIRTS, and his marital community; JOHN WIRTS, and his marital community; and QUEST RECOVERY; JOHN DOE and his marital community, | PUBLISHED OPINION<br><br>FILED: December 19, 2016 |
| Respondents. | |

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED
2016 DEC 19 AM 10: 54

BECKER, J. — We hold that instructions based on the *Restatement (Second) of Torts* §§ 205 and 206 (1965) correctly state the scope of a bail bondsman's privilege of entry onto land and dwellings.

The appeal arises from a civil case brought by appellant Ron Applegate against respondent Lucky Bail Bonds Inc. and its agents. Lucky posted bail for Applegate's daughter, Elizabeth. Elizabeth failed to appear for court dates. Lucky's agents went to Applegate's rural property at night in search of Elizabeth. They found her in Applegate's residence, but only after getting into a shoving match with Applegate and allegedly entering the residence without permission. Applegate filed suit alleging assault, trespass, and other causes of action.

The preliminary facts are not in dispute. Elizabeth was arrested for shoplifting and misdemeanor assault. In August 2011, Dorothy Applegate—Elizabeth's mother and Ron's wife—signed a bail bond indemnity agreement with Lucky to get Elizabeth released from custody. The agreement listed separate addresses for Dorothy and Elizabeth. Elizabeth missed two court dates in September 2011. Lucky was notified of Elizabeth's failure to appear. Lucky would have to forfeit the $4,000 bond amount if Elizabeth was not surrendered to the public authorities within 60 days. Elizabeth was not at the address given for her residence. Dorothy told Lucky's owner she did not know where Elizabeth was.

Lucky hired Greg Peterson, Cesar Luna, and John Wirts as bail bond recovery agents to locate, apprehend, and surrender Elizabeth to law enforcement officials. On the evening of October 27, 2011, Luna received a tip that Elizabeth was at that moment staying in a trailer near the Applegate residence. Luna called Peterson and Wirts. The agents met on a street near the Applegate property around 10:30 p.m. They saw some trailers on the side of the driveway and made a plan to start looking for Elizabeth there. As they approached, Applegate came out of his house onto the porch and began to yell at them to get off his property. Wirts came toward him. As he reached the porch stairs, a scuffle began. Applegate kicked Wirts. Wirts put his hands on Applegate. Luna came to the aid of Wirts. They struggled with Applegate and pinned him to the ground. In the fracas, they crashed through the doorway and

into the house. Applegate sustained broken ribs, and the doorway was damaged.

Elizabeth, it turned out, was inside the house. She came forward and submitted. The agents took her into custody, handcuffed her, and departed.

Applegate's civil cause of action went to a jury trial in superior court. The jury rendered a defense verdict.

## BONDSMAN'S PRIVILEGE

The jury reached its verdict under instructions defining the circumstances under which a bail bondsman has a privilege to enter land and dwellings to recapture a fugitive. Applegate assigns error to those instructions and seeks a new trial. He contends that under Washington law, bondsmen do not have a privilege to enter the private dwelling of a third party.

A claim that jury instructions misstated the law is reviewed de novo. Anfinson v. FedEx Ground Package Sys., Inc., 174 Wn.2d 851, 860, 281 P.3d 289 (2012).

The challenged instructions define the privilege of an actor who seeks to take into custody "a person for whose appearance in court security has been given by the actor." Instruction 39. Various terms are used to refer to the actor, including "bail bondsman," "bail," and "bail recovery agent." The bondee—Elizabeth, in this case—is typically referred to as "the principal."

Instruction 39 limited the privilege to enter "land in the possession of another" to situations when the bondsman reasonably believes the principal to be there:

3

The following privilege carries with it the privilege to enter land in the possession of another for the purpose of exercising the particular privilege, if the person sought is on the land or the actor reasonably believes him to be there:
the privilege to take into custody a person for whose appearance in court security has been given by the actor.

Instruction 39.

Instruction 41 limited the privilege to use force to enter any dwelling to situations when the principal is inside, or is reasonably believed to be inside, and generally "only after explanation and demand for admittance":

The privilege to enter land carries with it the privilege to use force to enter a dwelling if the person sought to be taken into custody is in the dwelling. Such force may be used only after explanation and demand for admittance, unless the actor reasonably believes such demand to be impractical or useless.
Although the person sought is not in the dwelling, the actor is privileged to use force if he reasonably believes him to be there, and enters in the exercise of a privilege
to take into custody a person for whose appearance in court security has been given by the actor.

Instruction 41.

The challenged instructions are based on the *Restatement (Second) of Torts*, chapter 8, "Privileged Entries on Land," in the division entitled "Intentional Harms to Persons, Land, and Chattels."

Instruction 39 is based on *Restatement (Second) of Torts* § 205, titled "Entry to Recapture or to Prevent Crime and in Related Situations."[1] Instruction

---

[1]The following privileges carry with them the privilege to enter land in the possession of another for the purpose of exercising the particular privilege, if the person sought is on the land or the actor reasonably believes him to be there: the privilege
(a) to recapture a person previously arrested in criminal or civil proceedings or a convicted prisoner, or

41 is based on *Restatement (Second) of Torts* § 206, titled "Forcible Entry of Dwelling to Arrest, Recapture, Prevent Crime, and Related Situations."[2]

In rejecting Applegate's argument that the privilege of forcible entry is limited to the principal's own dwelling, the trial court looked first to Washington's regulatory statute, chapter 18.185 RCW, "Bail Bond Agents." The statute defines a bail bond recovery agent as "a person who is under contract with a bail bond agent to receive compensation . . . for locating, apprehending, and

---

      (b) to take into custody under a warrant, valid or fair on its face, one who has been adjudged a lunatic, or

      (c) to recapture a person who having been adjudged a lunatic has been taken into custody, or

      (d) to take into custody a person for whose appearance in court security has been given by the actor, or

      (e) to prevent one from committing a serious crime or to detain a dangerous lunatic.

[2] (1) The privileges to enter land stated in §§ 204 and 205 carry with them the privilege to use force to enter a dwelling if the person sought to be taken into custody is in the dwelling. Such force may be used only after explanation and demand for admittance, unless the actor reasonably believes such demand to be impractical or useless.

(2) Although the person sought is not in the dwelling, the actor is privileged to use force as stated in subsection (1) if he reasonably believes him to be there, and enters in the exercise of a privilege

      (a) to make a criminal arrest under a warrant valid or fair on its face, or

      (b) to make a criminal arrest under an order of a court acting within its jurisdiction, or

      (c) to effect a recapture on fresh pursuit of one who has been lawfully arrested on civil or criminal proceedings or who is a convicted prisoner, or

      (d) to take into custody under a warrant valid or fair on its face, or to recapture on fresh pursuit, one who has been adjudged a lunatic, or

      (e) to take into custody a person for whose appearance in court security has been given by the actor, or

      (f) to prevent one from committing a serious crime or to control a dangerous lunatic.

5

surrendering a fugitive criminal defendant for whom a bail bond has been posted." RCW 18.185.010(10). The statute requires recovery agents to be trained, tested, and licensed. See RCW 18.185.250, .260, .280.

A bail bond recovery agent on a recapture mission must carry a copy of the contract pertaining to the individual fugitive and, if requested, must present the copy to "the fugitive criminal defendant, the owner or manager of the property in which the agent entered in order to locate or apprehend the fugitive, other residents, if any, of the residence in which the agent entered in order to locate or apprehend the fugitive, and to the local law enforcement agency or officer."[3] RCW 18.185.270(1). This language appears to contemplate, though it

---

[3] Wirts told Applegate that he had a "warrant" for Elizabeth. This was not true. He had a copy of the bail contract. A bail contract is not a warrant. Applegate asked the court to so instruct the jury. He claimed the intruders were unable to produce a warrant when he asked to see it and he reacted combatively because he believed they were intruders pretending to be police officers. "Had they come on and said we have a bail enforcement contract, none of this would have happened."

The court declined to give the requested instruction, concerned that it would be a comment on the evidence, and instead gave instruction 30, using the statutory language defining the obligation to produce the bail contract on request. The court did, however, state that the distinction between a warrant and a bail recovery contract was important, and the "imprecise language" was confusing and potentially misleading. Counsel for the defendants called the distinction "splitting of hairs." Counsel defended the use of the term "warrant" as "industry standard" and harmless even if deceptive because "the effect is the same."

We highlight the controversy involving the use of the term "warrant," but we do not resolve it as it has not been briefed as an issue on appeal. We note that the statutory definition of unprofessional conduct includes "making any statement that would reasonably cause another person to believe that the bail bond recovery agent is a sworn peace officer." RCW 18.185.110(10). The trial court informed the jury of this definition in instruction 23.

Under the common law, claiming to have a warrant may bear on the issue of whether the bondsman improperly identified himself. Livingston v. Browder, 51 Ala. App. 366, 367, 371, 285 So.2d 923 (1973). Some cases

does not specifically authorize, a bondsman's encounters with third parties on their property and in their dwellings.

Recovery agents are required to notify law enforcement before making a planned forced entry. RCW 18.185.300.[4] In this case, neither party contends that a forced entry was planned, so that section of the statute is not applicable. Recovery agents are required to notify the director within 10 business days of a forced entry, "whether planned or unplanned." RCW 18.185.090(4). While this phrase implies that the legislature envisioned unplanned forced entries, the statute does not specifically set forth the powers of an agent who conducts an unplanned forced entry.

A contract entered into between a bail bond agent and a bail bond recovery agent under the chapter "is authority for the person to perform the functions of a bail bond recovery agent as specifically authorized by the contract and in accordance with applicable law." RCW 18.185.280(3). Because the statute does not address privilege, the trial court correctly turned to the common law for guidance as to the "applicable law." The statute defers to the common law "as recognized in and derived from" the leading American case of Taylor v. Taintor, 83 U.S. (16 Wall.) 366, 21 L. Ed. 287 (1872):

---

indicate that a bondsman who purports to act pursuant to the authority of a warrant is in danger of being viewed as a state actor for purposes of 42 U.S.C. section 1983. See, e.g., U.S. v. Trunko, 189 F. Supp. 559 (E.D. Ark. 1960); Maynard v. Kear, 474 F. Supp. 794 (N.D. Ohio 1979).

[4] A law enforcement officer who assists or is in attendance during a planned forced entry is immune from civil action for damages arising out of actions taken by the bondsman. RCW 18.85.300(3). There is no grant of immunity for bondsmen.

7

> The legislature does not intend, and nothing in this chapter shall be construed to restrict or limit in any way the powers of bail bond agents as recognized in and derived from the United States supreme court case of Taylor v. Taintor, 16 Wall. 366 (1872).

RCW 18.185.260(4).

In Taylor, the principal—one McGuire—was bailed out of custody on a charge of grand larceny in Connecticut. He went to his home in New York and was there arrested and extradited to Maine, where he was wanted for burglary. Maine tried and convicted McGuire for burglary and sentenced him to 15 years. This made it impossible for him to appear as required in Connecticut. McGuire's sureties attempted to have performance on the bond excused due to grounds of the impossibility of bringing McGuire back from Maine. The Connecticut courts refused to excuse performance, and the Supreme Court affirmed, holding that the sureties should have never allowed McGuire to leave Connecticut and their liability was due to their own neglect. Taylor, 83 U.S. (16 Wall.) at 373. The Court recognized the broad power of a bail bondsman to seize the principal without process at any time for the purpose of delivering him for his appearance in court:

> When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; and, if necessary, may break and enter his house for that purpose. The seizure is not made by virtue of a new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner. In 6 Modern it is said: "The bail have their principal on a string, and may pull the string whenever they please, and render him in their discharge."

8

Taylor, 83 U.S. (16 Wall.) at 371-72 (footnotes omitted).

The power of a bail bondsman to seize the fugitive as set forth in Taylor explicitly includes the privilege to "if necessary . . . break and enter his house." Taking Taylor literally, Applegate contends that the bondsman's common law privilege of forcible entry extends only to the principal's own residence ("*his* house").

Taylor did not involve an encounter between bondsmen and third parties so the reference to "his house" is not dispositive. The privilege recognized by Taylor's common law antecedents is not limited by the ownership and privacy rights of third parties. Instead, it is limited by the obligation of the bondsman to act reasonably. The law "considers the principal as a prisoner" over whom bail may exercise its controlling power "at all times *and in all places.*" Nicolls v. Ingersoll, 7 Johns. 145, 156 (N.Y. 1810) (emphasis added), cited with approval in Taylor, 83 U.S. (16 Wall.) at 371 n.10. A "reasonable demand of entrance and a refusal" must precede a forcible entry, and "undue and unnecessary force" may not be used. Nicolls, 7 Johns. at 148-49.

Nicolls relies on the British case of Sheers v. Brooks (1792) 126 Eng. Rep. 463; 2 H. Bl. 120 (C.P.), a case cited by the Reporter's Notes to section 205 of the *Restatement*. In Sheers, the principal Nicholas Kempson was taken from another person's dwelling after a forced entry. That person sued for trespass. The defendants pleaded the principle of Semayne's Case (1603) 77 Eng. Rep. 194; 5 Co. Rep. 91 a (K.B.): "'The house of any one is not a castle or privilege but for himself, and shall not extend to protect any person who flies to

his house.'" Sheers, 126 Eng. Rep. at 464 (quoting Semayne's Case, 77 Eng. Rep. at 198). The court began with the premise that the third party's dwelling had become Kempson's dwelling by virtue of his presence there. "The house of the Plaintiff was considered, in this case, to be the house of the principal." Sheers, at 126 Eng. Rep. at 463 n.(a)[1]. The court ruled through Lord Loughborough that the defendants' plea was good: "When a party is bailed, the bail have a right to go into the house of the principal, as much as he has himself; they have a right to be constantly with him, and to enter when they please, to take him. *And I see no difference between a house of which he is solely possessed, and a house in which he resides by the consent of another.*" Sheers, at 126 Eng. Rep. at 464 (emphasis added). Judge Gould concurred: "It seems to me the same in effect, as if the principal had been sole occupier of the house; the Plaintiff received him into her house, subject to all the legal consequences, to which he would have been liable, if the house had been his." Sheers, at 126 Eng. Rep. at 464 (Gould, J., concurring). Nicolls and Sheers show that the common law allows a bondsman to recapture the fugitive from another person's dwelling so long as the stated limitations are heeded.

Instruction 39 stated the limitation that when third parties are in possession of the land, the bondsman must not enter without a reasonable belief the person sought will be found there. Instruction 41 stated the limitation that when third parties are inside a dwelling, the bondsman must first explain and demand admittance and even then must not enter forcibly without a reasonable belief the person sought is inside. These instructions, based on the

*Restatement*, reflect the common law stated in <u>Nicolls</u> and <u>Sheers</u> and implicitly recognized in <u>Taylor</u>.

One modern case cited by Applegate supports his position that under <u>Taylor</u>, there are no circumstances under which a bondsman is privileged to force entry into a third party's residence. <u>State v. Tapia</u>, 468 N.W.2d 342, 344 (Minn. Ct. App. 1991) ("The authority given to the bondsman to effectuate a principal's arrest does not extend to the forcible entry of a third party's residence.") <u>Tapia</u>'s unqualified holding is atypical. <u>Mishler v. State</u>, 660 N.E.2d 343, 346-47 (Ind. Ct. App. 1996) takes the same position but not unequivocally. While purporting to follow <u>Tapia</u>, the <u>Mishler</u> court suggests that an instruction on the privilege might be required if the bondsmen had actually seen the principal inside the third party's dwelling. <u>Mishler</u>, 660 N.E.2d at 347.

The issue sometimes arises in a bondsman's appeal from a criminal conviction for trespass or assault when the conviction is affirmed not by denying the privilege but instead by finding the bondsman's conduct was so egregious as to exceed the privilege. The only reported Washington case dealing with the use of force by a bondsman is in this category. See <u>State v. Portnoy</u>, 43 Wn. App. 455, 718 P.2d 805, <u>review</u> <u>denied</u>, 106 Wn.2d 1013 (1986). The bondsman, Portnoy, broke into the house of the principal. Not finding him there, Portnoy threatened two other occupants with a pistol. Charged and convicted of assault, Portnoy argued on appeal that the court should have instructed the jury that a bail bondsman has "a broader justification for the use of force than do other private citizens." <u>Portnoy</u>, 43 Wn. App. at 465-66. This court recognized

11

that a bondsman has "certain extraordinary powers under the common law, as the result of his contract with his client." Portnoy, 43 Wn. App. at 466. Nevertheless, we held the requested instruction was properly refused. "Portnoy offers no authority for the proposition that the bondsman may sweep from his path all third parties who he thinks are blocking his search for his client, without liability to the criminal law." Portnoy, 43 Wn. App. at 466. Portnoy stands for the proposition that a bondsman's privilege to use force is limited, not that it does not exist.

To similar effect is another case cited by Applegate, State v. Lopez, 105 N.M. 538, 734 P.2d 778 (1986), cert. denied, 479 U.S. 1092 (1987), cert. quashed, 105 N.M. 521, 734 P.2d 761 (1987), and rev'd on other grounds sub. nom., Lopez v. McCotter, 875 F.2d 273 (10th Cir. 1989). In Lopez, the bondsmen came from Texas to New Mexico to arrest the principal at the home of his parents, who refused to surrender him. Armed with guns, the bondsmen broke the door down, pointed a rifle at the father, and disarmed and threatened two deputies who responded to the mother's call for assistance. Lopez, 734 P.2d at 781. The bondsmen were convicted of serious crimes. One issue on appeal was the trial court's refusal to instruct on the common law privilege. Affirming, the court held that the common law arrest authority of bondsmen is qualified by the procedures of New Mexico's extradition statute. The court held the instructions offered by the defense were properly refused because they omitted that statutory limitation. Lopez, 734 P.2d at 782. The court also held

12

that the evidence was sufficient to support the convictions. Lopez, 734 P.2d at 784.

We do not read Lopez as a precedent for categorically rejecting any common law privilege to enter a third party dwelling. The analysis in Lopez turns on the bondsmen's defiance of extradition procedures. According to the ruling in the same case on habeas, the Lopez court gave short shrift to the common law privilege as a result of giving the extradition statute an unprecedented interpretation that the defendant could not have anticipated. McCotter, 875 F.2d at 277. The Lopez court allied itself with a decision from Oregon that disavows Taylor. Lopez, 734 P.3d at 784, citing State v. Epps, 36 Or. App. 519, 526, 585 P.2d 425 (1978). Our statute, by contrast, directs us to follow Taylor.

Other cases recognize more directly that bail bondsmen have a limited common law privilege to enter third party dwellings, depending on the facts of the case. See, e.g., Livingston v. Browder, 51 Ala. App. 366, 285 So. 2d 923 (1973); Mease v. State, 165 Ga. App. 746, 302 S.E.2d 429 (1983); State v. Mathis, 349 N.C. 503, 509 S.E.2d 155 (1998).

In Livingston, the court held that the bondsman had authority to enter the residence of the principal's mother over her objection. Because the trial court incorrectly instructed the jury that entry without consent was a trespass, a new trial was necessary. Livingston, 285 So. 2d at 927. In Mease, the evidence showed that the bondsmen's entry into the home of the principal's mother was not for an unlawful purpose, and therefore the trial court should have directed a

13

verdict in their favor on the charge of criminal trespass. Mease, 302 S.E.2d at 431. In Mathis, the court held the privilege is applicable when a third party's residence has for all practical purposes become the principal's residence. Mathis, 349 N.C. at 513, citing Sheers, 126 Eng. Rep. at 464. The evidence showed the bondsmen had a reasonable belief the principal was residing with his mother and she was interfering with their right to recapture him. Because the trial court refused to instruct the jury on the common law privilege, the bondsmen were entitled to a new trial. Mathis, 349 N.C. at 516. These three cases collectively demonstrate it is error *not* to give an appropriate instruction on the bondsman's common law privilege when there are facts to support it.

Applegate does not challenge the sufficiency of the evidence to support a defense verdict under the challenged instructions. Contrary to his argument, the instructions did not allow the jury to condone lawless behavior by rogue bounty hunters. If the jurors had believed the agents unreasonably attacked Applegate or broke into his home without reason to believe Elizabeth was there, the instructions required them to find that the agents exceeded the privilege and were acting unlawfully.

We conclude instructions 39 and 41 did not misstate the law.

STATUTORY TRESPASS

Applegate sued for trespass under RCW 4.24.630. The trial court instructed the jury that Applegate had to prove the defendants did not have a privilege to be on the property. The court rejected Applegate's proposed instruction, which did not place on him that burden of proof.

14

Contrary to Applegate's argument, a defendant's lack of privilege is an element of a statutory trespass claim that the plaintiff must prove. In relevant part, the statute states: "Every person who goes onto the land of another and . . . wrongfully injures personal property or improvements to real estate on the land, is liable . . . . For purposes of this section, a person acts 'wrongfully' if the person intentionally and unreasonably commits the act or acts while knowing, or having reason to know, that he or she *lacks authorization* to so act." RCW 4.24.630 (emphasis added).

Under the statute, the plaintiff must prove wrongful injury to property. An injury that is wrongful can be committed only by a person who "lacks authorization" so to act. If the respondents had a privilege to enter Applegate's property, they did not "lack authorization" under the statute. To prove that the respondents lacked authorization, Applegate had to prove that their conduct was unprivileged. The instruction on trespass did not misstate the law.

Affirmed.

Becker, J.

WE CONCUR:

Dwyer, J.

Cox, J.