A07A2070. GATEWAY ATLANTA APARTMENTS, INC.
v. HARRIS et al.
A07A2071. CLINE et al. v. HARRIS et al.
A07A2072. DOUGLASS FRONTIER, LLC et al. v. HARRIS et al.
A07A2073. WORTHING SOUTHEAST, INC. v. HARRIS et al.
(660 SE2d 750)

RUFFIN, Judge.

Donta Harris was shot and killed by a bail bondsman who was attempting to apprehend him for bond forfeiture. Ruthie Harris, the decedent's mother, brought a wrongful death action against the bail bondsmen who pursued Harris, the bail bonding companies with which they were associated, various issuers or insurers of bail bonds, and the owner and property manager of the apartment complex where Harris was shot. Several defendants moved to dismiss the action or for summary judgment. The trial court denied a number of the motions, and these four appeals followed. As the cases involve the same operative facts, we have consolidated them for this appeal. For reasons that follow, we reverse in all four cases.

The record shows that Edward Tatum was a bail bondsman in North Carolina. He bailed Harris out of jail in North Carolina several times. In November 1998, Harris needed to post a $10,000 bond; Tatum issued a $5,000 surety bond through Frontier Insurance Company,[1] and Henry Burke, who was a "runner" for Walter Cline of Fayetteville Bail Bonding Service, issued a $5,000 professional bond to Harris.[2]

When Harris failed to appear for court in June 1999, the court ordered forfeiture of Harris's bonds. Tatum obtained a copy of the

---

[1] We cannot consider "Exhibit 1" attached to appellees' brief in Case Nos. A07A2071 and A07A2072, which purports to show the relationship among the bail bondsmen. See Court of Appeals Rule 24 (g) ("Documents attached to an appellate brief, which have not been certified by the clerk of the trial court as a part of the appellate record and forwarded to this Court, shall not be considered on appeal.").

[2] In North Carolina, there are three general types of bail bonds: appearance or accommodation, professional, and surety. See N.C. Gen. Stat. §§ 15A-531, 58-71-1. A professional bail bond is secured by a bail bondsman's personal assets, while a surety bond is secured by the assets of an insurance company. See N.C. Gen. Stat. § 58-71-1 (3), (8), (11). Licensed bail bondsmen may utilize runners "for the purpose of assisting the bail bondsman in presenting the defendant in court when required, assisting in the apprehension and surrender of defendant to the court, keeping the defendant under necessary surveillance, or executing bonds on behalf of the licensed bondsman when the power of attorney has been duly recorded." N.C. Gen. Stat. § 58-71-1 (9).

order for arrest of Harris and sought to locate him.[3] Tatum and Burke found Harris in Georgia in October 1999, but were unable to capture him. In that instance, Tatum attempted to open the door of the vehicle Harris was driving; Harris "tried to crush [Tatum] in between the vehicles" and escaped following a high-speed chase.

Tatum then obtained an address for Harris in Georgia. In May 2000, Tatum and another bail bondsman, Sam Haynie, came to Atlanta and conducted surveillance of the apartment complex where Harris was living. Tatum had asked Haynie to accompany him to Georgia. Haynie was authorized to write professional bonds for Cline as a "runner" in addition to being a licensed bail bondsman in his own right. Tatum and Haynie spoke to a courtesy officer at the apartment complex about their intent to apprehend Harris. The courtesy officer, who was an off-duty DeKalb County police officer, told them he could not assist in capturing Harris. The officer did, however, indicate the building in which Harris was staying. Although Tatum showed the staff of the apartment complex his identification and the order for Harris's arrest, the staff refused to give Tatum an access code to enter the gated community.

Tatum and Haynie nevertheless gained entry to the apartment complex, where they saw Harris arrive, exit his vehicle, and enter an apartment. Because there were a number of children in the area on their way to school, they did not try to apprehend Harris at that time. Tatum and Haynie waited outside the apartment building for about an hour; when Harris reappeared, they attempted to arrest him, but he locked himself in his vehicle. Although Tatum and Haynie told Harris to put his hands up, he started the vehicle. Using a baton, Tatum broke two windows in the vehicle, then reached into the vehicle and attempted to turn it off. Harris put the vehicle into reverse and began backing up with Tatum hanging from the window. Harris shifted into drive and then reached down beside the seat. Tatum, believing Harris had a weapon, drew his own weapon and shot Harris. Harris died, and Tatum was arrested for involuntary manslaughter.

---

[3] See *North Carolina v. Mathis*, 349 N.C. 503 (509 SE2d 155) (1998) for a detailed discussion of the American system of bail and the codification of common law rights in North Carolina law. A surety has a right to seize his principal at any time and this seizure "is technically not an 'arrest' at all and may be accomplished without process of law." Id. at 510. A principal may be seized and surrendered to law enforcement without return of the premium paid for the bond if he, among other things, fails to appear for court, hides from the surety, or leaves the state without the surety's permission. See N.C. Gen. Stat. § 58-71-20.

## Case No. A07A2070

1. Gateway Atlanta Apartments, Inc. ("Gateway") owns the apartment complex where Harris was shot. The complex is managed by Worthing Southeast, Inc. ("Worthing"). Harris's estate claims that Gateway was negligent in failing to keep the premises safe, in failing to warn Harris that Tatum and Haynie had access to the property and intended to capture him, and in failing to protect Harris from the actions of Tatum and Haynie. In this appeal, Gateway asserts that the trial court erred in denying its motion for summary judgment because: (a) it owed Harris no duty of care as it had relinquished management of the property to Worthing; (b) if Gateway did owe Harris a duty of care, it was only such duty as owed to a trespasser or licensee; (c) Harris's knowledge of the risk was equal or superior to that of Gateway; and (d) Gateway was not responsible for the conduct of the courtesy officer, as he was acting in his capacity as a DeKalb County police officer.

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.[4] We conduct a de novo review of a trial court's ruling on a motion for summary judgment, viewing the evidence and all reasonable inferences and conclusions drawn from it in a light most favorable to the nonmoving party.[5] In Georgia,

> [w]here an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.[6]

All of the claims against Gateway "stem from [its] alleged failure to keep the premises safe and, essentially, constitute a breach of the same duty to protect [Harris]."[7]

A landlord is not an insurer of a tenant's safety against third party criminal attacks; "any liability from such attacks must be predicated on a breach of duty to 'exercise ordinary care in keeping the premises and approaches safe.'"[8] A landlord may be liable only for foreseeable criminal acts, as its liability is based upon "superior knowledge of the existence of a condition that would subject a tenant

---

[4] See OCGA § 9-11-56 (c).

[5] See *Reece v. Turner*, 284 Ga. App. 282, 283 (643 SE2d 814) (2007).

[6] OCGA § 51-3-1.

[7] *Traicoff v. Withers*, 247 Ga. App. 428, 429, n. 5 (544 SE2d 177) (2000).

[8] Id. at 429-430.

to an unreasonable risk of harm."[9] The victim may not recover, however, if he had equal or superior knowledge of the risk and failed to exercise ordinary care for his own safety.[10]

Pretermitting whether Gateway owed Harris a duty of care, whether his status was that of invitee, licensee or trespasser, or whether Gateway was responsible for the courtesy officer's conduct, we conclude that, under these circumstances, Gateway did not have superior knowledge that a criminal act would be committed.[11] Viewing the facts in a light most favorable to Harris, at most Gateway knew that two armed bail bondsmen intended to seize Harris on a valid order for arrest. Harris argues that Gateway knew "that a potentially dangerous incident would occur when [the bail bondsmen] attempted to arrest [Harris]," that the courtesy officer did not know if Tatum and Haynie were properly trained in arrest techniques, and that the courtesy officer "had no reason to believe that the bondsmen had notified the authorities about their presence as required by state law." We find no authority, however, for Harris's contention that Gateway had a duty to interfere with what appeared to be a valid arrest, to investigate the training or practices of licensed bail bondsmen, or to make an independent determination whether the seizure of Harris would be lawful.[12]

Moreover, we conclude that in this situation Harris had equal or superior knowledge of any danger posed to him by the bail bondsmen and failed to exercise ordinary care for his own safety.[13] Harris knew that he was wanted for bond forfeiture and that bail bondsmen were actively seeking him; Tatum had already attempted to arrest him in Georgia several months earlier. And Harris chose to flee rather than to cooperate, increasing the danger to himself. "Although the issue of a plaintiff's exercise of due diligence for his own safety is ordinarily a question for the jury, it may be summarily adjudicated where the plaintiff's knowledge of the risk is clear and palpable."[14] Harris's own actions led to the dangerous situation in which he found himself;

---

[9] Id. at 430.

[10] See *Habersham Venture v. Breedlove*, 244 Ga. App. 407, 410 (1) (535 SE2d 788) (2000).

[11] We assume for purposes of this analysis that Tatum's shooting of Harris was a criminal act.

[12] See generally *Traicoff*, supra at 430 (no affirmative duty exists to intervene in a criminal act).

[13] See *Snellgrove v. Hyatt Corp.*, 277 Ga. App. 119, 123-125 (3) (625 SE2d 517) (2006) (hotel not liable to injured guest for fight, although its employees had stopped his earlier fight with attacker, as guest made conscious decision to return to hotel where attacker was); *Griffin v. AAA Auto Club South*, 221 Ga. App. 1, 2-3 (1) (470 SE2d 474) (1996) (employer not liable for attack on employee in its parking lot, even though it knew employee's boyfriend had threatened her; employee had specific knowledge of attacker and the "nature of their relationship").

[14] (Punctuation omitted.) *Johnson v. Atlanta Housing Auth.*, 243 Ga. App. 157, 160 (3) (532 SE2d 701) (2000).

thus, we find that his knowledge of the danger was at least equal to that of Gateway and that he failed to exercise ordinary care under the circumstances.[15] The trial court erred in denying summary judgment to Gateway.[16]

### Case No. A07A2071

2. Cline and Fayetteville moved to dismiss the action against them for lack of personal jurisdiction and moved for summary judgment. Both motions were denied, and Cline and Fayetteville appeal. Harris's estate claims that Cline and his company are liable for Harris's death both because Haynie was acting as their agent when Harris was shot and because Cline and his company were involved in a joint enterprise or venture with Tatum. Burke, who was a "runner" for Cline and Fayetteville, had issued a $5,000 professional bond to Harris in 1998 under Cline's authority. Burke, however, was ultimately liable on the bond, not Cline. Haynie, who was with Tatum when he shot Harris, was a "runner" for Cline and Fayetteville but was also a licensed bail bondsman in his own right. Cline and Fayetteville did not submit W-2 tax forms for Haynie or provide health insurance or other employment benefits.

Haynie contends that he came to Georgia in his individual capacity at the behest of Tatum and without Cline's knowledge or encouragement. On appeal, Cline and Fayetteville argue that they are entitled to summary judgment because they cannot be held liable under the theories of joint enterprise or respondeat superior for the actions of either Tatum or Haynie, and that they should have been dismissed for lack of personal jurisdiction.

(a) We must determine if a genuine issue of material fact exists as to whether Cline and Fayetteville are liable for Haynie's actions under the theory of respondeat superior.[17] A master may be liable for the tort of his servant if the servant's actions were "by [the master's] command or in the prosecution and within the scope of his business."[18] To determine whether a master and servant relationship exists, we consider

---

[15] See id. at 160 (2), (3).

[16] See *McCullough v. Reyes*, 287 Ga. App. 483, 488 (2) (651 SE2d 810) (2007).

[17] Here, the underlying tort is the alleged unlawful seizure and subsequent shooting of Harris that resulted in his death. While Tatum was generally authorized to seize his principal, Harris, Harris's estate contends that the seizure became unlawful when Tatum and Haynie failed to notify Georgia law enforcement of their intent to apprehend Harris in violation of OCGA § 17-6-57.

[18] OCGA § 51-2-2.

the right of the employer to control the activities of the employee in the employment duties. The main tests are whether the master is granted or assumes the right to control the time, manner, means, and method of executing the work, and whether the master has the right to discharge the servant. Another issue to be considered is whether the master receives a benefit from the servant's actions.[19]

"An employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer."[20]

Cline and Fayetteville contend that Haynie's actions while in Georgia were undertaken in his individual capacity. Both Cline and Haynie have submitted affidavits stating that Haynie accompanied Tatum to Georgia in his individual capacity and without Cline's knowledge. Haynie avers that he accompanied Tatum to Georgia at Tatum's request, expected to be paid by Tatum, and that he was not acting on Cline's behalf or with his knowledge or direction. Cline also states that he

did not employ, direct, authorize[,] or instruct [Tatum] or [Haynie] to travel to Georgia to apprehend [Harris]. In fact, [he] never spoke with either [Tatum] or [Haynie] regarding their intent to apprehend or detain [Harris], and they certainly were not acting on [his] behalf in any capacity.

Tatum, however, testified in his deposition that, while he decided to ask Haynie to accompany him, he did so because "with [Haynie] working with [Cline], he was legally able to go with me on that bond" and that Cline recommended Haynie's involvement. And Harris's estate points to evidence that Cline knew that Haynie was seeking to capture Harris.

Even taking all the evidence cited by Harris's estate as true, we do not find that Haynie had a master-servant relationship with Cline and Fayetteville. Haynie had his own bail bonding business and, while he was authorized to write bonds for Cline as a "runner," there is no evidence that Cline and Fayetteville controlled the time, manner, means, or method by which Haynie did his work.[21] It follows that

---

[19] (Punctuation omitted.) *MCG Health v. Nelson,* 270 Ga. App. 409, 413 (4) (606 SE2d 576) (2004).

[20] OCGA § 51-2-4.

[21] See *Metro Taxi v. Brackett,* 273 Ga. App. 122, 123 (614 SE2d 232) (2005); *Jacobs v. Thomson Oak Flooring,* 250 Ga. App. 56, 57-59 (1) (550 SE2d 465) (2001).

the trial court should have granted summary judgment to Cline and Fayetteville on the respondeat superior claim.[22]

(b) We next address whether a genuine issue of material fact exists as to Cline and Fayetteville's involvement in a joint venture with Tatum. "A joint venture arises where two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control. Without the element of mutual control, no joint venture can exist."[23] In order for one party to be liable for the negligence of another under a joint venture theory, the party must have had the right to direct and control the conduct of the other party in the activity causing the injury.[24] "The mere existence of a business interdependency does not create a joint venture."[25]

In this case, we find no evidence that Cline or Fayetteville had any right to direct or control Tatum's conduct in the apprehension of Harris. Tatum testified that he owned his own business and had sole decision making authority for it. Under these circumstances, where no mutual control existed, we find as a matter of law that Cline and Fayetteville were not engaged in a joint venture with Tatum to apprehend Harris.[26] We therefore reverse the trial court's denial of Cline and Fayetteville's motion for summary judgment on this ground.[27]

(c) Because of our holdings in Divisions 2 (a) and (b), we need not address Cline and Fayetteville's enumeration of error relating to the denial of their motion to dismiss for lack of personal jurisdiction.

### Case No. A07A2072

3. Frontier Insurance Company ("Frontier") was the underwriter for the surety bond Tatum issued to Harris. Douglass Frontier, LLC ("DFL"), a California limited liability company, performed management and administrative services for Frontier; R. Spencer Douglass, a California resident, was its manager/member. Thomas M. Apodaca, a North Carolina resident, is the president and owner of Southeast Sureties Group, Inc. ("SES"). Apodaca and SES recruited licensed bail bondsmen to write surety bail bonds underwritten by Frontier in North Carolina; one of the bail bondsmen they recruited was Tatum. Harris's estate seeks recovery from DFL, Douglass, Apodaca, and

---

[22] See *MCG Health*, supra.

[23] (Citations and punctuation omitted.) *Kitchens v. Brusman*, 280 Ga. App. 163, 167 (3) (633 SE2d 585) (2006).

[24] See *Williams v. Chick-Fil-A*, 274 Ga. App. 169, 170 (617 SE2d 153) (2005).

[25] *Pope v. Goodgame*, 223 Ga. App. 672, 674 (2) (478 SE2d 636) (1996).

[26] See id.; *Kitchens*, supra.

[27] See *Kelleher v. Pain Care of Ga.*, 246 Ga. App. 619, 620 (540 SE2d 705) (2000).

SES based on claims that Tatum was acting as their agent both when he issued Harris's bond and when he shot Harris. DFL, Douglass, Apodaca, and SES moved for summary judgment and to dismiss the claims against them for lack of personal jurisdiction. The trial court granted their motions for summary judgment in part, denied them in part, and denied their motions to dismiss. This appeal followed.

(a) Harris's estate argues that DFL, Douglass, Apodaca, and SES are subject to personal jurisdiction under both OCGA § 9-10-91 (1) and (2), because, through Tatum, they transacted business and committed a tortious act in Georgia. The estate does not contend that DFL, Douglass, Apodaca, or SES took any action in Georgia other than through Tatum. Accordingly, our analysis of whether the trial court has personal jurisdiction over DFL, Douglass, Apodaca, and SES turns on their business relationship with Tatum. Harris's estate contends that Tatum was the agent of DFL, Douglass, Apodaca, and SES and "was acting within the scope of his agency when he shot and killed Harris," thus bringing them within the ambit of the Georgia Long Arm Statute. DFL, Douglass, Apodaca, and SES, however, assert that their relationship with Tatum was an attenuated one such that they could not reasonably have anticipated being haled into a Georgia court for Tatum's actions.

Georgia courts may exercise personal jurisdiction over a nonresident who transacts business within this state.[28] The following requirements must be met: first, the nonresident must have purposefully done an act or consummated a transaction in Georgia; second, the cause of action must arise from or be connected with such act or transaction; and third, the exercise of jurisdiction by the courts of this state must not offend traditional fairness and substantial justice.[29] The first two prongs of this test are used to determine whether the nonresident has established minimum contacts with the state.[30] Due process requires that the nonresident have performed purposeful acts to tie itself to Georgia, and these minimum contacts "may not be merely 'random,' 'fortuitous,' or 'attenuated.' "[31]

The record shows that Tatum entered into a "Bail Bond Underwriting Agreement" (the "Agreement") with Douglass and Apodaca under which Douglass was to supply surety bail bonds from one or

---

[28] See OCGA § 9-10-91 (1).

[29] See *Robertson v. CRI, Inc.*, 267 Ga. App. 757, 759 (601 SE2d 163) (2004).

[30] See *Aero Toy Store v. Grieves*, 279 Ga. App. 515, 518 (1) (631 SE2d 734) (2006).

[31] (Punctuation omitted.) *Home Depot Supply v. Hunter Mgmt.*, 289 Ga. App. 286, 289 (656 SE2d 898) (2008).

more underwriters to Tatum.[32] The Agreement defined Tatum's position as that of independent contractor, stating that Tatum

> shall have exclusive control over his retail bail business, shall set his or her own working hours, and shall retain or discharge employees or independent contractors in [his] sole discretion. [Tatum] shall not use the name of [Douglass] in any advertising or in any manner which induces a belief that [Tatum] is an employee of, or in any way associated with [Douglass] other than [Douglass] supplying bonds to [Tatum] in a wholesale manner. [Tatum] shall receive no wages, salaries[,] or other compensation from [Douglass]. [Tatum] is solely responsible for seeking out and obtaining any specialized knowledge and skills necessary in his or her professional function.

The Agreement further provided that Tatum was solely responsible for all bond administration, including deciding to whom bonds would be issued and satisfying bond forfeitures, and "for the apprehension, holding, movement, arrest, extradition[,] and/or surrender of errant bond principals." Douglass and DFL had no ownership interest in Tatum's business and did not instruct Tatum in how to run his business or control his decisions whether to issue a bond or to apprehend a principal who failed to appear for court. In fact, Douglass has never met or spoken to Tatum.

Apodaca served as Frontier's "general agent" in North Carolina, recruiting independent bail bond companies to purchase surety bonds from Frontier. He also monitored the status of the bonds issued and reported back to Frontier. Apodaca and SES had no ownership interest in Tatum's business and did not control his business decisions, including his decision to issue a professional bond or a surety bond or to apprehend a principal who failed to appear for court. When a licensed bail bondsman issued a surety bond through Frontier, he charged the principal a fee of ten to fifteen percent of the bond. Out of that fee, SES would receive approximately two percent of the bond and DFL approximately one percent in premium payments. DFL and SES would not share in any profit made by the bail bondsman. If a principal forfeited his bond to the court, the bail bondsman who issued the surety bond would ultimately be responsible for paying it.

---

[32] Tatum was licensed to issue both professional and surety bonds in North Carolina. As discussed above, a professional bond is secured by the assets of the bail bondsman deposited with the state, while a surety bond is secured by the assets of an insurance company.

We agree with DFL, Douglass, Apodaca, and SES that Tatum was an independent contractor, as they had no right to exercise control over the time, manner, and method of his work.[33] And we are unpersuaded that the use of the term "agent" to describe Tatum in the Agreement overcomes the evidence that he was an independent contractor. Under these circumstances, where DFL, Douglass, Apodaca, and SES did not exercise control over Tatum's conduct or business, had no knowledge that he intended to travel to Georgia to apprehend Harris, and are only alleged to have acted through Tatum, we cannot say that they purposefully acted in Georgia so as to subject themselves to personal jurisdiction here.[34] Similarly, we also conclude that DFL, Douglass, Apodaca, and SES are not subject to personal jurisdiction under OCGA § 9-10-91 (2)[35] as the only torts alleged were committed by Tatum in his capacity as an independent contractor. We therefore reverse the trial court's denial of DFL, Douglass, Apodaca, and SES's motions to dismiss for lack of personal jurisdiction.

(b) Because we find that DFL, Douglass, Apodaca, and SES's motions to dismiss for lack of personal jurisdiction should have been granted, we need not address their remaining enumerations of error.

*Case No. A07A2073*

4. Worthing, the property manager of the apartment complex, also appeals the denial of its motion for summary judgment. Harris's estate sought to hold Worthing liable on the same grounds as those asserted against Gateway. For the reasons set forth in Division 1, we conclude that the trial court erred in denying Worthing's motion for summary judgment.

*Judgments reversed in Case Nos. A07A2070, A07A2071, A07A2072 and A07A2073. Blackburn, P. J., and Bernes, J., concur.*

DECIDED MARCH 10, 2008 —
RECONSIDERATION DENIED APRIL 7, 2008 — 

*Alisa W. Ellenburg*, for appellant (case no. A07A2070).
*Alston & Bird, Jay D. Bennett*, for appellants (case no. A07A2071).

---

[33] See OCGA § 51-2-4; *Metro Taxi*, supra.

[34] See *Catholic Stewardship Consultants v. Ruotolo Assoc.*, 270 Ga. App. 751, 754-757 (1) (608 SE2d 1) (2004); *Behar v. Aero Med Intl.*, 185 Ga. App. 845, 849-850 (2) (366 SE2d 223) (1988).

[35] OCGA § 9-10-91 (2) provides that Georgia courts may exercise personal jurisdiction over a nonresident who "[c]ommits a tortious act or omission within this [S]tate."

*Fain, Major & Brennan, Gene A. Major, Michael J. Walker*, for appellants (case no. A07A2072).

*Gray, Rust, St. Amand, Moffett & Brieske, Harvey S. Gray*, for appellant (case no. A07A2073).

*Cochran, Cherry, Givens, Smith, Sistrunk & Sams, Jane L. Sams, Warren N. Sams III, Shean D. Williams, Alexander Gordon*, for appellees.