**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**July 3, 2012**

# In the Court of Appeals of Georgia

A12A0158. BENNETT v. MARTA.

BARNES, Presiding Judge.

Reginald Bennett was assaulted in the Hamilton Holmes MARTA station and sued MARTA for failing to keep its premises safe from reasonably foreseeable unlawful acts. MARTA answered and denied liability, and following discovery, moved for summary judgment, arguing that Bennett had equal or superior knowledge of the danger and failed to exercise ordinary care for his own safety. The trial court agreed and granted summary judgment to MARTA. After reviewing the record, including the depositions of Bennett and the MARTA agent on duty, as well as video recordings of the assault, we reverse.

"On appeal from the trial court's grant of summary judgment, we conduct a de novo review of the record to determine whether the evidence, viewed in the light most

favorable to the nonmoving party, demonstrates a genuine issue of material fact." *Walker v. Aderhold Props.*, 303 Ga. App. 710 (694 SE2d 119) (2010). Summary judgment is proper only when no issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Id. Generally, in premises liability cases,

> to survive a motion for summary judgment, a plaintiff must come forward with evidence that, viewed in the most favorable light, would enable a rational trier of fact to find that the defendant had actual or constructive knowledge of the hazard. At that point, the burden of production shifts to the defendant to produce evidence that the plaintiff's injury was caused by his or her own voluntary negligence (intentional disregard of a known risk) or causal negligence (failure to exercise ordinary care for one's personal safety). If the defendant succeeds in doing so, the burden of production shifts back to the plaintiff to come forward with evidence that creates a genuine dispute of fact on the question of voluntary or causal negligence by the plaintiff or tends to show that any such negligence resulted from the defendant's own actions or conditions under the defendant's control.

(Footnote omitted.) *American Multi-Cinema, Inc. v. Brown*, 285 Ga. 442, 444-445 (2) (679 SE2d 25) (2009). See also OCGA § 51-3-1. Liability is these cases is based on the landowner's superior knowledge of perils on the property and the resultant danger to visitors. *Gateway Atlanta Apts. v. Harris*, 290 Ga. App. 772, 774 (1) (660 SE2d

2

750) (2008). While a plaintiff who fails to exercise ordinary care for his safety may be precluded from recovery even if the landowner has superior knowledge of the risk,

> as a general proposition issues of negligence, contributory negligence and lack of ordinary care for one's own safety are not susceptible of summary adjudication but should be resolved by trial in the ordinary manner. The trial court can conclude as a matter of law that the facts do or do not show negligence on the part of the defendant or the plaintiff only where the evidence is plain, palpable and undisputable.

*Robinson v. Kroger Co.*, 268 Ga. 735, 739 (1) (493 SE2d 403) (1997).

Bennett, who is five feet three inches tall, was a regular MARTA customer, and on the night he was attacked, he asked a man in the elevator standing in front of him with a backpack to move over a little. Another passenger began to scold Bennett and the other man not to bump into her baby, and Bennett and the man told her they had not been talking to her. The woman began cussing at them, and continued "ranting and raving and carrying on" after they got off the elevator as Bennett headed toward his bus. When the woman began threatening to "whip [Bennett's] behind," he responded that she did not know him and was not going to whip him. Another man on crutches who was with the woman "kind of picked up the slack where she left off

3

about what he was going to do," and continued to threaten him. Bennett answered, "[N]o, you're not," and continued toward his bus stop.

Bennett became concerned that the man was "rounding up his little troops [from] all over the place," and aware that the station had a gang problem, and suddenly four additional men surrounded him, all threatening to "kick his MFA." Bennet observed to the man that he had a lot of friends, and a MARTA station agent, whose job was to "look for safety issues" walked up, put his hands on Bennett's shoulder, and said, "[D]on't worry about it. Don't waste your time. You know, it ain't worth it." The gang of men dispersed and Bennett went to wait for his bus at the loop.

The agent testified that the station was a "fast-paced environment" that required video surveillance and a constant police presence nearby. Agents were trained in "verbal judo" to control tense situations, and are supposed to contact a police officer when a confrontation arises. A woman came up to him the night of this incident and reported that a fight was about to occur by the elevator, and the agent went to the area "because incidents happen all the time" and he was trained in conflict resolution. His job was to control the situation, and his goal was "protection, not confrontation." When he arrived in the area he saw "six black males shouting at a middle-aged, heavyset black male," and he tried to use his radio to contact Central

Dispatch "to let them know what was going on," but it did not work because his battery was too low. He told the group to break it up and go their separate ways or they would end up in jail, and several of the men agreed that the agent made sense. "Everybody stopped" and started to walk away.

The station agent "wanted to make sure [he] verbally resolved the situation," because at that station, "you have a lot of situations." He watched two of the men go to one side of the loop to wait for a bus, Bennett go to the other side to wait for his bus, and the other men walk off. The agent "was hoping they left" and because the men waiting for their buses were far apart and the situation appeared to have resolved, he returned to finish his lunch in the station office.

Bennett initially sat on the bench in the bus loop area that was furthest from the station and began talking on his cell phone, then got up and walked to an area closer to the station while he continued to talk. Two people walked by him and got on a bus that was waiting just forward of where Bennett was standing, then seven more people walked by. A woman sat on the bench just behind Bennett and another man sat on the bench just ahead of him. After Bennett had been standing and talking on his phone facing the station for almost four and a half minutes, two men approached him quickly. One passed Bennett then immediately turned back toward him as the other

man stepped up and struck Bennett to the ground with enough force that he turned a complete somersault. Bennett got up and retrieved the cell phone and backpack that had been knocked from his hands as three more men approached quickly. Bennett began to walk quickly toward the front of the waiting bus and the five men followed. Bennett stopped and one of the men circled around and came straight at him, striking him again.

The men milled around Bennett as yet another patron walked by the group, but their actions are not clear from the recording because they are standing behind the bus shelter that is roofed and enclosed with glass panels. The woman who sat down in the shelter before the assault began remained seated during the incident while one of the mob stood directly in front of her. Bennett moved away from the crowd, into view of the security camera as an assailant struck him repeatedly, then moved back behind the shelter as he absorbed more blows. Suddenly five more men ran into view and joined the assault, and the mob moved down the sidewalk past the front of the waiting bus, hitting and kicking Bennett as they moved. During the assault, Bennett yelled for help. As he was on the ground, someone took money from his pocket and from his bookbag. One of the assailants raised a crutch over his head and slammed it down into Bennett's body, then the mob suddenly turned and ran away.

6

Bennett staggered toward the closest bench and sat down, while the man and woman sitting on nearby benches during the entire assault ignored him. About 45 seconds later, the bus that had been parked at the curb right next to the mob drove away. Bennett began to use his cell phone to try to call for help, and the recording showed him standing, sitting, standing, and finally walking into the street while he looked back and forth. He finally walked off camera eleven minutes after the assault began, and another camera showed him approach a police officer a few minutes later. Bennett was taken to Grady Memorial Hospital, where he was admitted and treated for a fractured orbital socket in his face, among other things.

The station agent testified that he always rechecks the area where a confrontation occurs "to make sure it's okay," and in this case, after he returned the station office to finish his lunch, he decided to recheck the area. The agent "stepped back out" and "saw these guys running around." He figured "something was going on," but he could not contact a dispatcher because he had forgotten to charge the battery in his radio. The agent ran downstairs, saw Bennett on the ground, and waived down a nearby police officer, who caught one of the suspects. The agent and officer located and arrested other assailants who had been hiding in a bus.

7

MARTA argued it was entitled to summary judgment because Bennett had superior knowledge of the danger he would be assaulted when he chose "to inject himself into a volatile and potentially dangerous situation by arguing with people on the elevator." Bennett also knew the assailants remained in the station after the MARTA agent broke up the verbal fight but "made no effort to see to his own safety by either remaining where he was [waiting for the bus], calling the police, or notifying another MARTA employee." Instead, MARTA argued, Bennett chose to walk toward the mob when they began to approach him, and thus failed to exercise ordinary care to avoid the danger of being physically assaulted.

The trial court granted summary judgment to MARTA, concluding that as an adult of ordinary intelligence, Bennett was "aware of the manifest risks of deliberately and voluntarily engaging in a verbal altercation," and then, seeing a "mob" moving toward him, chose to walk toward them instead of calling for help. The court held that MARTA was entitled to summary judgment because Bennett had equal or superior knowledge of the danger posed by the people who had threatened to harm him and failed to exercise ordinary care,.

8

Bennett argues that the trial court erred in granting MARTA's motion for summary judgment because the evidence establishes that questions of fact exist for a jury to determine. We agree.

There is no evidence that Bennett chose to assume the risk that he would be physically assaulted by a gang of ten or more men because he had words with a rude woman and her companions on an elevator, or that he had superior knowledge that the gang would assault him. To the contrary, he testified that he was not arguing with them, just telling them that they were not going to "whup [his] ass" that day. Bennett thought that the exchange was "just words being thrown out, you know, and that didn't bother me. It wasn't [any]thing physical." He did not think they were going to do anything to him physically, which is why he kept moving away toward his bus stop. He had heard "trash talk" all his life, and "never got assaulted from trash talking, from having somebody talk trash to me and by me responding to trash talk."

Further, the recording of the assault contained in the record establishes that Bennett did not move toward the mob to confront the men instead of taking some other evasive action. He had been waiting for his bus for six minutes before the assault began, and for three and a half of those minutes he stood at the curb, talking on his cell phone. During that time at least eight MARTA patrons walked by him, and

he stood by a MARTA bus whose driver was aboard the entire time. He saw men gathering inside the station, in the area where the station agent worked, and looked to see if they were coming toward him. By that time, the men had crossed the short distance between the station and Bennett at a "trot run" and were "almost in [his] face" immediately. He did not attempt to call 911 when he first saw them because he thought that "at 46 years old trying to run around with a cell phone running from 17-to-20 year old, . . . athletic-looking youths, I wouldn't have made it." Rather than try to run away, which would have taken him away from the station, he tried to "cover up" and protect himself as best he could, and as soon as they reached him, he "went down . . . and everything was blurry and pitch-black by then."

In contrast, the record contains evidence that MARTA had superior knowledge that the men might escalate the confrontation. The MARTA agent testified that he always rechecks the area where a confrontation occurred "to make sure it's okay. It's not the first time." Usually he stayed on location, but in this case he returned to his office instead, which was a "nice walk" from the area, and then decided to go back and check on the situation, but by that time the assault had already occurred.

Given these facts, none of the cases MARTA cites control. In one case the plaintiff got out of his car to confront someone who spit at him and was struck when

10

he got back in. *Rappernecker v. L.S.E.*, 236 Ga. App. 86 (510 SE2d 871) (1999). In another, the decedent crossed the street to join a fight. *Cornelius v. Morris Brown College*, 299 Ga. App. 83, 86 (681 SE2d 730) (2009) ("an adult of ordinary intelligence will be held to be aware of manifest risk or danger of possible injury when he deliberately and voluntarily joins in an affray, as a matter of law"). Another plaintiff failed to exercise ordinary care by returning to his motel room after he had a fight with his co-workers, who were attending a party at the hotel and who fought with him again. *Snellgrove v. Hyatt Corp.*, 277 Ga. App. 119 (625 SE2d 517) (2006). Finally, a theater patron chose to confront an audience member who was cursing instead of moving or seeking help. *Fernandez v. Ga. Theater Co.*, 261 Ga. App. 892 (583 SE2d 926) (2003). Here, Bennett did not approach the men who had begun a verbal altercation with him earlier, nor did he exchange any words with them before they physically attacked him. He was standing at the bus stop, which is what he had been told to do by the MARTA agent, and his options were limited by the time he saw the men gathering in the station, in the area where the station agent had been. He would have had to run away from the station to get away from them, and according to him, he had no time to summon help on his cell phone. The bus driver was sitting in the bus parked right beside him, and other patrons were in the vicinity.

11

"[T]he 'routine' issues of premises liability, i.e., the negligence of the defendant and the plaintiff, and the plaintiff's lack of ordinary care for personal safety are generally not susceptible of summary adjudication, and that summary judgment is granted only when the evidence is plain, palpable, and undisputed." *Dickerson v. Guest Srvcs. Co. of Va.*, 282 Ga. 771, 771-772 (653 SE2d 699) (2007), citing *Robinson*, 268 Ga. at 749. The evidence in this case is not plain, palpable, and undisputed, and liability should be determined by a jury. The trial court therefore erred in granting summary judgment to MARTA.

*Judgment reversed. Adams and McFadden, JJ., concur.*