IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-1143

Filed: 15 December 2020

Harnett County, Nos. 18 CRS 50953-59, 434

STATE OF NORTH CAROLINA

v.

MARC CHRISTIAN GETTLEMAN, SR.

and

MARC CHRISTIAN GETTLEMAN, II

and

DARLENE ROWENA GETTLEMAN

Appeal by defendants from judgments entered 3 June 2019 by Judge V. Bradford Long in Harnett County Superior Court. Heard in the Court of Appeals 22 September 2020.

*Attorney General Joshua H. Stein, by Special Deputy Attorneys General M. Denise Stanford and Daniel Snipes Johnson, and Assistant Attorney General Heather H. Freeman, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Wyatt Orsbon, for defendant-appellant Marc Christian Gettleman, Sr.*

*Kellie Mannette for defendant-appellant Marc Christian Gettleman, II.*

*Anne Bleyman for defendant-appellant Darlene Rowena Gettleman.*

ZACHARY, Judge.

Defendants[1] Marc Christian Gettleman, Sr., ("Big Marc"), Defendant Marc Christian Gettleman, II, ("Little Marc") and Darlene Rowena Gettleman ("Darlene") appeal from judgments entered upon a jury's verdicts finding them guilty of multiple offenses, all relating to an incident that occurred on 15 March 2018. After careful review, we conclude that Defendants received a fair trial, free from prejudicial error.

## *Background*

In October 2017, Justin Emmons was placed on probation for two felony offenses and was ordered to find gainful employment as one of the conditions of his probation. Big Marc and Darlene hired Justin in November 2017 as a mechanic for their towing service and garage. While working for Big Marc and Darlene, Justin lived with their adult son, Little Marc.

In December 2017, Justin violated the terms of his probation by missing scheduled appointments and failing drug tests, and he was arrested. Big Marc and Darlene posted bond for Justin, using their business and home as collateral. Then, one day in mid-January 2018, Justin failed to show up to work. When Justin appeared that evening, Big Marc handcuffed him, and Defendants took him to the Harnett County Jail and surrendered him in order to have their property released from the bonds.

---

[1] For ease of reading and clarity—and consistent with the parties' briefs, the record, and the transcripts of the proceedings below—we refer to Defendant Marc Christian Gettleman, Sr., as "Big Marc," Defendant Marc Christian Gettleman, II, as "Little Marc," and Defendant Darlene Rowena Gettleman as "Darlene."

Darlene and Big Marc then paid Robert West, a professional bail bondsman, $1,500 to post one of two $15,000 bonds for Justin ("the January bonds"). Justin agreed to make payments to West on the balance owed to West for posting the second $15,000 bond. In addition, West required that Darlene and Big Marc execute an indemnity agreement, guaranteeing payment to West of any amounts that he should have to pay to the State in the event of the January bonds' forfeiture due to Justin's failure to appear.

On or about 11 March 2018, Justin left his job and his residence without informing Defendants. Darlene and Little Marc repeatedly attempted to phone Justin, but he did not respond to any of their calls or voicemails. Defendants kept West informed as they "called everybody [they] knew" in an attempt to locate Justin. Among the people who Defendants contacted was Justin's girlfriend, Nina. Little Marc told her that he would pay her $100 for information concerning Justin's whereabouts.

On the morning of 15 March 2018, Justin's brother Ryan picked him up in his Ford F150 truck and took him to a friend's garage to work on Ryan's classic Ford Mustang. Around midday, the brothers went to a nearby convenience store to buy some lunch. Nina told Little Marc that Justin would be at the convenience store, and Defendants went there to apprehend Justin. Big Marc notified West that they knew

where Justin was, that they were going to pick him up, and that they would bring Justin with them to the jail.

Darlene drove Big Marc and Little Marc to the convenience store in her Ford Expedition SUV. When they arrived, Big Marc went inside to use the restroom. However, Justin was at the convenience store earlier than expected, and he saw Big Marc enter the store. Justin then told Ryan that he was leaving to avoid a confrontation with Defendants. Justin walked past Darlene and Little Marc as they sat in the Expedition, and Darlene told Little Marc "to get out, see if he [could] catch him." Little Marc followed Justin, who then "took off through the neighborhood." Little Marc kept pace with Justin for two or three blocks before he ran out of breath.

Darlene called Big Marc and told him that Justin had exited the convenience store and that Little Marc had followed him. Big Marc came out to the Expedition, and he and Darlene drove around searching for Justin. While he was running, Justin called Ryan and told him to pick him up. Big Marc and Darlene saw Justin jumping into Ryan's truck at the entrance to a neighborhood.

At trial, the parties gave varying testimonies of what happened next. Justin testified that Big Marc exited the Expedition, pointed a gun at him, and said, "[F]reeze or I'll shoot you," but that Justin kept running. Justin further testified that Darlene got out of the car and fired a gun, either at him or at the ground, as she

chased him. Then Justin saw Ryan pull his truck around, and he flagged Ryan down and jumped in the truck.

In contrast, Big Marc testified that he did not point a gun at Justin, but rather that he merely yelled at him from the Expedition. He further testified that Darlene got out of the vehicle, carrying his gun, and said that she would run after Justin. Big Marc got in the driver's seat of the Expedition and strayed into the bushes and birdbath of a yard as he turned the vehicle around, prompting the homeowners to scream and yell at him. Big Marc then heard what he thought may have been gunshots coming from the yard behind him. Big Marc saw Darlene chasing Justin, but he thought that Justin was too far ahead for Darlene to catch him, so he parked the Expedition across the center median and told her to get back in the vehicle.

Darlene's account is similar to Big Marc's. She testified that she exited the Expedition, unarmed, started running after Justin, and fell. Darlene gathered herself and returned to the Expedition. She explained that, with traffic approaching from both directions, they could not move from the center median.

Big Marc and Darlene both testified that they saw Ryan's truck, with Justin inside, lurching haltingly toward the passenger's side of the Expedition, as if Ryan was alternatively hitting the gas and then the brake. Big Marc got out of the Expedition, saw traffic backed up behind them, and told Darlene to exit the vehicle on the driver's side. As Darlene climbed over the console, she saw Ryan's truck "in

the air." Big Marc testified that Darlene was "three-quarters of the way out" of the vehicle when Ryan's truck hit the Expedition and "just rolled."

The State's evidence differed markedly in this respect from Defendants'. Ryan testified that Big Marc drove the Expedition, against traffic, "directly at" them, so Ryan tried to merge into the middle lane to avoid a collision. He testified that Big Marc followed "into the middle lane with me, like PIT maneuvered the right side of my -- back of my truck, and it flipped over[.]"[2] Justin testified that Ryan "tried to veer out around [Big Marc and Darlene], and they just rammed his truck, just hit his truck, and ended up rolling us over."

Ryan's truck flipped over onto its roof. Justin and Ryan crawled out of the passenger's side window as Big Marc and Darlene approached the truck. Big Marc handcuffed Justin. Ryan and Big Marc began shouting at each other, before Ryan ran off.

Detective Joshua Teasley, of the Harnett County Sheriff's Office, testified that he received a call that there were "shots fired" and responded to the scene. He saw Ryan's overturned pickup truck, and traffic backed up in both directions. Darlene approached Detective Teasley, wearing a camouflage jacket and a badge around her neck. She told Detective Teasley, "[W]e have a $35,000 bond on [Justin] and he is trying to skip bond[,]" which led the detective to believe that Darlene "was a

---

[2] "[A] 'Precision Intervention Technique ("PIT") maneuver . . . causes [a] fleeing vehicle to spin to a stop.'" *Scott v. Harris*, 550 U.S. 372, 375, 167 L. Ed. 2d 686, 691 (2007).

bondsman." Detective Teasley then walked around to the other side of the vehicle, where he saw Justin, handcuffed, with Big Marc holding the other cuff, and "began to try to figure out what was going on."

Justin and Darlene exchanged words in Detective Teasley's presence. Justin "seemed incredulous that she shot at him. He kept saying, you shot at me, you shot at me." Darlene replied that she did not shoot at him, but rather "at the ground." Detective Teasley called for EMS, because Justin said that he was in pain from the knee injury that he suffered when Ryan's truck rolled. Big Marc handed the cuffs to Darlene, who handcuffed herself to Justin and said, "[G]uess we're both going to Central Harnett Hospital." Justin got into the ambulance, and Darlene rode with him.

As more law enforcement officers responded to the scene, Little Marc approached the Expedition on foot, having heard the collision. At the direction of a state trooper, Little Marc moved the Expedition to the parking lot of a nearby fire station. Detective Teasley testified that "some of Justin's family arrived, and there was a pretty heated incident down at the fire station." Law enforcement officers responded to that scene as well, and they escorted Little Marc to his own vehicle, which was parked nearby. Big Marc testified that, as officers responded to the fire station scene, a highway patrolman told him to pick up Darlene at the hospital. Big Marc drove the Expedition to the hospital, arriving at approximately the same time

as West. West took custody of Justin at the hospital, and when Justin was released, West took him to jail.

By the time Detective Teasley and other law enforcement officers had "finished talking with the parties involved" in the scene at the fire station, Detective Teasley noticed that "the ambulances [were] gone, [Defendants] were gone and their vehicle was gone." Detective Teasley testified that "the tenor of the investigation changed" hours later, when they "found out [Defendants] were not bondsmen[.]" Detective Teasley called Little Marc and requested that Defendants return to the scene.

Law enforcement officers interviewed each Defendant separately. Defendants admitted that they were not bondsmen, but both Darlene and Little Marc claimed that West told them to "do whatever [they] ha[d] to do" to apprehend Justin, short of crossing state lines or "us[ing] deadly force unless deadly force [wa]s used" against them.

On 29 May 2018, a grand jury returned indictments charging Big Marc with two counts of assault by pointing a gun, two counts of assault with a deadly weapon, and one count each of injury to personal property causing damage in excess of $200, acting as an unlicensed bondsman or runner, reckless driving, disorderly conduct, armed robbery, second-degree kidnapping, conspiracy to commit armed robbery, conspiracy to commit second-degree kidnapping, and felony hit and run resulting in injury. The grand jury also returned indictments charging Darlene with two counts

of assault by pointing a gun, two counts of assault with a deadly weapon, and one count each of injury to personal property causing damage in excess of $200, acting as an unlicensed bondsman or runner, going armed to the terror of the people, disorderly conduct, failure to remain at the scene of an accident, armed robbery, second-degree kidnapping, conspiracy to commit armed robbery, and conspiracy to commit second-degree kidnapping. Finally, the grand jury returned an indictment charging Little Marc with conspiracy to commit armed robbery, conspiracy to commit second-degree kidnapping, acting as an unlicensed bondsman or runner, and disorderly conduct.

On 20 May 2019, Defendants' cases came on for a joint jury trial in Harnett County Superior Court before the Honorable V. Bradford Long. On 23 May 2019, at the close of the State's evidence, Defendants' counsel made separate motions to dismiss some of the charges against Defendants: (1) the robbery and kidnapping charges, and each of the corresponding conspiracy charges; (2) the felony hit-and-run charge against Big Marc and the charge of failure to remain at the scene of an accident charge against Darlene; (3) the disorderly conduct charge against Little Marc; and (4) the charge of going armed to the terror of the people against Darlene. The trial court granted Defendants' motion to dismiss the conspiracy charges as to each Defendant, but denied the other motions. On 24 May 2019, the State voluntarily dismissed one count of assault with a deadly weapon against Darlene. At the close of

all of the evidence, Defendants' counsel renewed the previously denied motions to dismiss, and the trial court again denied these motions.

On 28 May 2019, the jury returned its verdicts. The jury found Big Marc guilty of both counts of assault with a deadly weapon, as well as the counts of injury to personal property causing damage in excess of $200, acting as an unlicensed bondsman or runner, reckless driving, disorderly conduct, and second-degree kidnapping. The jury found Darlene guilty of acting as an unlicensed bondsman or runner, disorderly conduct, failure to remain at the scene of an accident, and second-degree kidnapping. Lastly, the jury found Little Marc guilty of acting as an unlicensed bondsman or runner. The jury found Defendants not guilty of all remaining charges.

After consolidating Big Marc's and Darlene's offenses for sentencing, the trial court sentenced Big Marc to 25–42 months' imprisonment and Darlene to 18–34 months' imprisonment, both sentences to be served in the custody of the North Carolina Division of Adult Correction. The trial court sentenced Little Marc to 10 days in the custody of the Harnett County Sheriff. Defendants gave oral notices of appeal in open court.

## *Discussion*

Defendants raise multiple issues on appeal. Both Darlene and Little Marc argue that the trial court erred in denying their motions to dismiss the charges of

acting as an unlicensed bondsman or runner. Little Marc also argues that the trial court committed plain error due to a variance between the indictment and the jury instructions with respect to the charge of acting as an unlicensed bondsman or runner. Big Marc argues that the trial court erred in admitting into evidence, over his objection, a recording of a 911 call, in which the caller gave what Big Marc claims was inadmissible lay-opinion evidence.

Defendants' remaining arguments turn on the same question of statutory interpretation: whether Defendants acted as sureties or accommodation bondsmen under N.C. Gen. Stat. § 58-71-1 (2019). First, Defendants essentially argue that the trial court committed plain error in failing to instruct the jury that they could have considered their actions to be the lawful acts of either sureties or accommodation bondsmen.[3] For the same reason, Little Marc also argues that the indictment against him "fails to allege a crime and is fatally defective." Finally, Darlene argues that the trial court erred in denying her motions to dismiss the second-degree kidnapping charge where, *inter alia*, there existed insufficient evidence of an unlawful confinement because she "had the legal authority [as a surety] to restrain Justin."

I. *Motions to Dismiss*

---

[3] To wit: Big Marc argues that "when viewed in the light most favorable to [him], the evidence from trial is sufficient to support a surety defense." Darlene argues that "it was prejudicial error for the jury not to be instructed [she] did not need to be licensed as a bondsman." Little Marc argues that "the jury was instructed they could find Little Marc guilty for actions constituting no offense." The success of each of these arguments hinges on whether Defendants qualified as either sureties or accommodation bondsmen under N.C. Gen. Stat. § 58-71-1.

Both Darlene and Little Marc argue that the trial court erred in denying their motions to dismiss the charges of acting as an unlicensed bondsman or runner. However, upon careful review of the transcript, we conclude that Darlene and Little Marc failed to move to dismiss these charges, and therefore arguments related to the sufficiency of the evidence on these charges were not preserved for appellate review.

At the close of the State's evidence, defense counsel[4] did not make one, single motion to dismiss all the charges, but rather made a series of targeted "motions to dismiss *some* of" the charges. (Emphasis added). After defense counsel moved to dismiss the armed robbery and kidnapping charges, as well as the corresponding conspiracy charges, the trial court asked: "Were there other charges you wanted to be heard on?" Counsel indicated that there were, and the trial court responded: "Well, let's do it piecemeal, then. What else do you want to be heard about[?]" Defense counsel then moved to dismiss the felony hit-and-run charge against Big Marc and Darlene's charge for failure to remain at the scene of an accident.[5] The trial court granted Defendants' motions to dismiss the conspiracy charges, but denied "[a]ll other motions to dismiss at the close of the [S]tate's evidence[.]"

---

[4] Although Defendants have separate appellate counsel, they shared the same trial counsel.

[5] Defense counsel framed this motion as one to dismiss "both of the hit-and-run offenses as well as the charge against [Darlene] for failing to remain at the scene of an accident[.]" However, there was only one hit-and-run charge. The trial court interpreted this as a motion to dismiss the felony hit-and-run charge against Big Marc and the charge of failure to remain at the scene of an accident against Darlene. Insofar as the charges of acting as an unlicensed bondsman or runner are not implicated, our preservation analysis is not affected.

The following exchange then occurred:

> [DEFENDANTS' COUNSEL]: And I had more charges that I was going to --
>
> THE COURT: I beg your pardon. You're messing with me, man. I thought you were finished. You keep sitting down. Go ahead.
>
> [DEFENDANTS' COUNSEL]: And do you want me to do all of mine?
>
> THE COURT: Let's just -- yeah, let's go through them.
>
> [DEFENDANTS' COUNSEL]: Okay. As to the --
>
> THE COURT: Let the record reflect that the court announcing that all motions were denied was based on the court's erroneous assumption [Defendants' counsel] had concluded his motion. The court now retracts that. The motion to dismiss as to the charge of armed robbery as to [Big Marc] and [Darlene] are denied. The motion to dismiss at the close of the [S]tate's evidence as to second-degree kidnapping lodged against [Big Marc] and [Darlene] are denied. The motion[ ] to dismiss [the charge against Darlene] for misdemeanor failure to remain at the scene of an accident as a passenger is denied. The motion to dismiss felony hit-and-run against [Big Marc] is denied.

Defense counsel then moved to dismiss Little Marc's charge for disorderly conduct, and Darlene's charge for going armed to the terror of the people. The trial court denied these motions as well.

At no point did defense counsel move to dismiss the charges of acting as an unlicensed bondsman or runner, or move to dismiss *all charges against Defendants*. Moreover, at the close of all of the evidence, defense counsel moved to "renew [the]

motions to dismiss *that haven't previously been allowed.*" (Emphasis added). Defense counsel did not make any new motions to dismiss either these now-challenged charges, or all of the charges, as permitted by our rules. *See* N.C.R. App. P. 10(a)(3) ("A defendant may make a motion to dismiss the action . . . at the conclusion of all the evidence, irrespective of whether defendant made an earlier such motion."); N.C. Gen. Stat. § 15A-1227(a)(2). In addition, the trial court did not consider or rule on the sufficiency of the evidence with regard to the charges of acting as an unlicensed bondsman or runner.

Our Supreme Court recently clarified that "under Rule 10(a)(3), a defendant's motion to dismiss preserves all issues related to sufficiency of the State's evidence for appellate review." *State v. Golder*, 374 N.C. 238, 246, 839 S.E.2d 782, 788 (2020). However, at issue in *Golder*, in which the defendant moved to dismiss both charges against him, was whether all arguments regarding the sufficiency of the evidence are preserved for appellate review with a properly timed motion to dismiss, even if defense counsel makes specific arguments regarding certain elements of a particular charge before the trial court. *See id.* at 242–43, 839 S.E.2d at 785–86. The *Golder* Court reviewed a line of cases in which this Court had developed a categorical approach to reviewing different types of motions to dismiss, and held that this Court's "jurisprudence, which ha[d] attempted to categorize motions to dismiss as general,

specifically general, or specific, and to assign different scopes of appellate review to each category, is inconsistent with Rule 10(a)(3)." *Id.* at 249, 839 S.E.2d at 790.[6]

Nevertheless, the *Golder* Court recognized the fundamental precept that "Rule 10(a)(3) requires a defendant *to make a motion to dismiss* in order to preserve an insufficiency of the evidence issue[.]" *Id.* at 245, 839 S.E.2d at 788 (emphasis added). This is especially relevant because where, as here, a defendant moves to dismiss some—but *pointedly not all*—of the charges against him or her, it follows that the targeted motions to dismiss certain charges cannot preserve issues concerning the sufficiency of the evidence regarding the charges that the defendant *deliberately chose not to move to dismiss*.

In this case, defense counsel did not specifically move to dismiss the charges of acting as an unlicensed bondsman or runner, nor generally move for dismissal of *all charges* against Defendants. And as the trial court's oral ruling—quoted above—makes plain, the court did not rule upon the sufficiency of the evidence of the charges

---

[6] The *Golder* Court summarized our Court's "three categories" of motions to dismiss as:

> (1) a 'general,' 'prophylactic' or 'global' motion, which preserves all sufficiency of the evidence issues for appeal; (2) a general motion, which preserves all sufficiency of the evidence issues for appeal, even though a defendant makes a specific argument as to certain elements or charges; and (3) a specific motion, which narrows the scope of appellate review to only the charges and elements that are expressly challenged.

*Id.* (citation omitted).

of acting as an unlicensed bondsman or runner in considering the motions to dismiss advanced by defense counsel at trial.

Although pursuant to *Golder* a timely motion to dismiss preserves for appeal all issues regarding sufficiency of the evidence with respect to *that charge*, we do not conclude that our Supreme Court intended its holding to cover the circumstances presented by this case, where Defendants specifically and deliberately did not move to dismiss *all charges*.[7] Accordingly, we hold that a targeted motion to dismiss one charge for insufficiency of the evidence does not operate to preserve for appellate review arguments related to the sufficiency of the evidence of charges for which no motion to dismiss was made, and upon which the trial court has not had an opportunity to rule. We are unable to review issues upon which the trial court has not ruled.

Our Supreme Court's opinion in *Golder* also forecloses appellate review of Little Marc's argument that a fatal variance existed between the indictment and the jury instruction on the charge against him of acting as an unlicensed bondsman or runner. Although Little Marc cites several pre-*Golder* cases which have reviewed variances between an indictment and jury instructions for plain error, any fatal

---

[7] Indeed, in its first substantive opinion interpreting *Golder*, our Supreme Court described a defendant's motion to dismiss the only charge against him as "a general motion to dismiss[.]" *State v. Smith*, 375 N.C. 224, 229, 846 S.E.2d 492, 494 (2020). This suggests that, although this Court's pre-*Golder* categorical analysis was "inconsistent with Rule 10(a)(3)," *Golder*, 374 N.C. at 249, 839 S.E.2d at 790, our Supreme Court nevertheless acknowledges that "a general motion to dismiss" remains distinguishable from more specific motions to dismiss.

variance argument is, essentially, an argument regarding the sufficiency of the State's evidence. *Cf. State v. Locklear*, 259 N.C. App. 374, 382–84, 816 S.E.2d 197, 204–05 (2018) (finding plain error in jury-instruction variance based upon the sufficiency of the State's evidence at trial); *State v. Ross*, 249 N.C. App. 672, 676, 792 S.E.2d 155, 158 (2016) (same). Our Supreme Court made clear in *Golder* that "moving to dismiss at the proper time under Rule 10(a)(3) preserves *all* issues related to the sufficiency of the evidence for appellate review." *Golder*, 374 N.C. at 249, 839 S.E.2d at 790. As Little Marc's argument fundamentally presents an issue "related to the sufficiency of the evidence" that he did not "mov[e] to dismiss at the proper time", *id.*, he has waived appellate review of this issue.[8]

Darlene and Little Marc also petition this Court to suspend our rules of appellate procedure pursuant to N.C.R. App. P. 2, and to review these arguments despite the lack of preservation. Our appellate courts possess the "inherent authority to suspend the rules in order to prevent manifest injustice to a party[.]" *State v.*

---

[8] Assuming, *arguendo*, that Little Marc's argument regarding a jury-instruction variance is reviewable for plain error, he cannot show that the trial court plainly erred because the asserted error does not concern "an *essential element* of the crime charged." *State v. Lu*, ___ N.C. App. ___, ___, 836 S.E.2d 664, 667 (2019) (citation omitted). Little Marc argues that while the indictment charged him with "violat[ing] the statute by attempting to and taking Justin into custody, the jury was instructed they could find Little Marc guilty of violating the statute for a large number of actions." However, as Little Marc recognizes in his appellate brief, in our *Golder* opinion this Court held that the State was not required "to specify the exact manner in which [a defendant] allegedly violated [s]ection 58-71-40" in an indictment charging the offense of acting as an unlicensed bondsman or runner. *State v. Golder*, 257 N.C. App. 803, 809, 809 S.E.2d 502, 506 (2018), *aff'd as modified*, 374 N.C. 238, 839 S.E.2d 782 (2020). Accordingly, this argument does not concern "an *essential element* of the crime charged," *Lu*, ___ N.C. App. at ___, 836 S.E.2d at 667 (citation omitted), and the trial court did not err, much less plainly err.

*Moore*, 335 N.C. 567, 612, 440 S.E.2d 797, 823 (citation and internal quotation marks omitted), *cert. denied*, 513 U.S. 898, 130 L. Ed. 2d 174 (1994). However, as discussed below, we are unpersuaded by Defendants' arguments concerning the charges against them of acting as unlicensed bondsmen or runners. We thus find no "manifest injustice" to justify our invocation of Rule 2, and we decline to do so. Accordingly, we dismiss these issues as unpreserved.

II.    *Admissibility of 911 Call*

Big Marc contends that the trial court erred by admitting a recorded 911 call in which the caller repeatedly states that Big Marc hit Ryan's truck with his Expedition "on purpose." On appeal, Big Marc argues that the recording was inadmissible as speculative lay-opinion testimony under Rule 701 of the North Carolina Rules of Evidence. However, careful review of the transcript reveals that Big Marc did not present this argument to the trial court. Thus, this issue was not preserved for appellate review.

Our Rules of Appellate Procedure provide that

> [i]n order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection, or motion.

N.C.R. App. P. 10(a)(1).

Where a defendant objects to the admission of evidence before the trial court and states a specific ground as the basis for that objection, but raises a different ground as the basis for his argument on appeal, the issue is not preserved. *State v. Hueto*, 195 N.C. App. 67, 71, 671 S.E.2d 62, 65 (2009). In *Hueto*, the defendant "never stated to the trial court that he objected to" the challenged evidence on the relevancy grounds he raised on appeal. *Id.* Instead, "it appear[ed] from the context that [the d]efendant objected . . . on hearsay grounds" before the trial court. *Id.* This Court therefore concluded that the defendant's issue was not preserved, and dismissed the issue. *Id.*

Here, Big Marc's counsel objected when the State moved to admit the recordings of two 911 calls, "on hearsay grounds as well as confrontational grounds." After hearing arguments from the parties, the trial court overruled Big Marc's "objection on both hearsay grounds and confrontation grounds." The parties never made, nor did the trial court rule upon, any arguments concerning Rule 701 and lay opinion testimony with respect to either of the 911 calls.

Our appellate courts have "long held that where a theory argued on appeal was not raised before the trial court, the law does not permit parties to swap horses between courts in order to get a better mount" on appeal. *State v. Sharpe*, 344 N.C.

190, 194, 473 S.E.2d 3, 5 (1996) (citation and internal quotation marks omitted).

Accordingly, Big Marc may not present his new argument for appellate review.[9]

"In criminal cases, an issue that was not preserved by objection noted at trial . . . nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C.R. App. P. 10(a)(4).

On appeal, Big Marc invokes the plain error rule, but only with regard to the sufficiency and timeliness of his hearsay and Confrontation Clause objections at trial, not his failure to raise the argument that he now advances on appeal. Although Big Marc contends that the judicial action questioned—the admission into evidence of the recorded 911 call—amounted to plain error, he does not do so "specifically and distinctly" with respect to the argument he now makes to this Court. *Id.* Accordingly, we conclude Big Marc has not complied with Rule 10(a)(4).

Moreover, assuming, *arguendo*, that Big Marc had adhered to Rule 10(a)(4)'s procedural requirements, he would still not be entitled to plain error review. Under Rule 701, "whether a lay witness may testify as to an opinion is reviewed for abuse of

---

[9] In his appellate brief, Big Marc references the Confrontation Clause argument made at trial solely to support his argument that the newly asserted Rule 701 error was prejudicial to him. Indeed, in his reply brief, Big Marc explicitly disclaims any implication that he raises a confrontation argument on appeal: "The State also appears to believe Big Marc is challenging the admission of the 911 call on confrontation grounds. *Big Marc raises no such argument on appeal*. He does discuss the lack of an opportunity to cross-examine the unavailable caller—but only in explaining how the inability to question the caller prejudiced Big Marc at trial. But *Big Marc makes no freestanding claim regarding the admissibility of the 911 call under the Confrontation Clause*." (Emphases added) (citations omitted).

discretion." *State v. Washington*, 141 N.C. App. 354, 362, 540 S.E.2d 388, 395 (2000), *disc. review denied*, 353 N.C. 396, 547 S.E.2d 427 (2001). Our Supreme Court "has not applied the plain error rule to issues which fall within the realm of the trial court's discretion[.]" *State v. Steen*, 352 N.C. 227, 256, 536 S.E.2d 1, 18 (2000), *cert. denied*, 531 U.S. 1167, 148 L. Ed. 2d 997 (2001).

For all of these reasons, we will not apply plain error review to the trial court's ruling in this instance. *See id.* Accordingly, we dismiss as unpreserved Big Marc's argument concerning the admission of the challenged 911 call.

III.    *"Surety" or "Accommodation Bondsman"*

As previously mentioned, Defendants present several issues that turn on the question of whether, under our General Statutes, they acted lawfully as sureties or accommodation bondsmen with respect to the January bonds. Big Marc and Darlene argue that the trial court erred in failing to instruct the jury on their "surety defense"—that is, that they acted lawfully as sureties or accommodation bondsmen. For similar reasons, Little Marc argues that the indictment against him "fail[ed] to allege a crime" and thus was "fatally defective." Darlene additionally argues that the trial court erred in denying her motion to dismiss the charge of second-degree kidnapping because she had the legal authority as a surety or accommodation bondsman to confine or restrain Justin.

A.   *Standard of Review*

Issues of statutory interpretation present questions of law, which this Court reviews de novo. *State v. Dudley*, ___ N.C. App. ___, ___, 842 S.E.2d 163, 164 (2020).

> Our task in statutory interpretation is to determine the meaning that the legislature intended upon the statute's enactment. The intent of the General Assembly may be found first from the plain language of the statute, then from the legislative history, the spirit of the act and what the act seeks to accomplish.

*Id.* (citations and internal quotation marks omitted).

### B. *Analysis*

The parties agree that our statutes provide that "[n]o person shall act in the capacity of a professional bondsman, surety bondsman, or runner or perform any of the functions, duties, or powers prescribed for professional bondsmen, surety bondsmen, or runners under this Article *unless that person is qualified and licensed*[.]" N.C. Gen. Stat. § 58-71-40(a) (emphasis added). Defendants do not argue that they were so qualified and licensed. Instead, they present arguments that they acted lawfully, either as sureties or accommodation bondsmen. We disagree.

Big Marc and Darlene maintain that they were sureties on Justin's bonds, and that therefore their actions were lawful. Both cite the definition for "surety" from Chapter 58, Article 71 of our General Statues, which governs bail bondsmen and runners: "[o]ne who, with the principal, is liable for the amount of the bail bond upon forfeiture of bail." *Id.* § 58-71-1(10). Notably, there is no licensing requirement for a

surety under Chapter 58, Article 71. This is distinct from a "surety bondsman", which

is separately defined as

> [a]ny person who is licensed by the Commissioner [of Insurance] as a surety bondsman under [Chapter 58, Article 71], is appointed by an insurer by power of attorney to execute or countersign bail bonds for the insurer in connection with judicial proceedings, and who receives or is promised consideration for doing so.

*Id.* § 58-71-1(11).

As Big Marc and Darlene do not argue that they were licensed bondsmen, their

arguments that their unlicensed actions were lawful rest on the proposition that they

were sureties on the January bonds, pursuant to the definition of section 58-71-1(10).

Their arguments rely on our holding that "[t]he common law, recognized in North

Carolina for many years and codified by statute, *authorizes the surety on a bail bond,*

or a bail bondsman acting as his agent, *to arrest and surrender the principal* if he

fails to make a required court appearance." *State v. Mathis*, 126 N.C. App. 688, 691,

486 S.E.2d 475, 477 (1997) (emphasis added), *aff'd*, 349 N.C. 503, 509 S.E.2d 155

(1998)[10]; *see also* N.C. Gen. Stat. § 15A-540(b) ("After there has been a breach of the

conditions of a bail bond, . . . . [a] surety may arrest the defendant for the purpose of

returning the defendant to the sheriff."). "This statutory right of arrest granted the

surety does not change—but simply codifies a part of—the common law powers of

---

[10] For "a brief overview of the history of the American system of bail," see *Mathis*, 349 N.C. at 508–11, 509 S.E.2d at 158–60.

sureties that have always been recognized in our state." *Mathis*, 349 N.C. at 513, 509 S.E.2d at 161.[11]

However, our holding in *Mathis* is immaterial in the present context unless Big Marc and Darlene were, in fact, acting as sureties on the January bonds. They contend that they were. Big Marc argues that "[b]oth the State's evidence and [Defendants'] testimony show Big Marc and Darlene were 'on' Justin's bonds as sureties." He particularly highlights the State's argument that "the Gettlemans' purpose in restraining the movement of Justin Emmons was financial. That is, they feared a loss." Likewise, Darlene argues she "was a surety who was personally liable for the amount of Justin's two bail bonds upon forfeiture of that bail." However, these arguments lack merit.

First, these arguments do not account for the definition of "surety" found in section 15A-531, which supersedes the definition of "surety" in section 58-71-1(10) in circumstances where they conflict. *See id.* § 58-71-195 ("[I]n the event of any conflict between the provisions of this Chapter and those of Chapter 15A of the General Statutes of North Carolina, the provisions of Chapter 15A shall control and continue in full force and effect."). In section 15A-531, "surety" is defined more narrowly, to mean:

---

[11] We note here that the sureties in *Mathis* were "licensed bail bondsmen." *Mathis*, 126 N.C. App. at 690, 486 S.E.2d at 476. *Mathis*, and its discussion of the statutory and common-law authority of sureties to arrest their principals, is thus inapplicable to the case at bar for this simple reason, in addition to the other reasons we discuss herein.

a. The insurance company, when a bail bond is executed by a bail agent on behalf of an insurance company.

b. *The professional bondsman, when a bail bond is executed by a professional bondsman or by a runner on behalf of a professional bondsman.*

c. The accommodation bondsman, when a bail bond is executed by an accommodation bondsman.

*Id.* § 15A-531(8) (emphasis added). As a matter of interpreting the plain language of our statutes, we can come to no other conclusion than this: because the January bonds were executed by West, a professional bondsman[12], he is the "surety" on the bonds as a matter of statutory law. *See id.* § 15A-531(8)(b). Defendants cannot be sureties on the January bonds, because those bonds were "executed by a professional bondsman" who was the true surety. *Id.*

Further review of our bail bond statutes also defeats Big Marc's and Darlene's arguments that they acted as sureties. While Big Marc and Darlene may have been personally liable in the event of the forfeiture of the January bonds, they would not have been personally liable *to the State*. *See id.* § 15A-531(4) (defining a "[b]ail bond" as "an undertaking by the defendant to appear in court as required upon penalty of forfeiting bail *to the State* in a stated amount[,]" which may include "an appearance bond secured by at least one solvent surety." (emphasis added)); *accord id.* § 58-71-

---

[12] A "professional bondsman" is "[a]ny person who is approved and licensed by the Commissioner and who pledges cash or approved securities with the Commissioner as security for bail bonds written in connection with a judicial proceeding and who receives or is promised money or other things of value in exchange for writing the bail bonds." *Id.* § 58-71-1(8).

1(2). The evidence at trial suggested that Big Marc and Darlene would have been personally liable in the event of forfeiture, but only to West—the *actual* surety on the January bonds—and only as indemnitors. Simply put, agreeing to indemnify a bondsman on a bail bond does not a surety make.

Finally, Darlene argues in the alternative that she "was an accommodation bondsman who did not charge Justin a fee or receive any consideration for her action *as a surety*[,]" tracking the definition of "accommodation bondsman" found in Chapter 58, Article 71. That Article defines an "accommodation bondsman" as:

> A person who shall not charge a fee or receive any consideration for action as surety and who endorses the bail bond after providing satisfactory evidences of ownership, value, and marketability of real or personal property to the extent necessary to reasonably satisfy the official taking bond that the real or personal property will in all respects be sufficient to assure that the full principal sum of the bond will be realized if there is a breach of the conditions of the bond.

*Id.* § 58-71-1(1).[13]

However, in that Darlene did not act as a surety, she cannot meet this definition of an accommodation bondsman as a matter of plain statutory interpretation. Additionally, although Darlene references section 15A-531(8)(c) in her

---

[13] Little Marc also relies on this definition to support his argument that "[t]he criminal act of acting as an unlicensed bondsman/runner cannot be committed by conduct Article 71 specifically authorizes for individuals who are not licensed bondsmen." In challenging the indictment charging him with acting as an unlicensed bondsman or runner, Little Marc argues that, "because the authority to arrest is specifically vested in unlicensed individuals under Article 71, it cannot serve as a violation of the law against acting as an unlicensed bondsman/runner." For the reasons discussed herein, we disagree.

reply brief in support of this argument, she fails to reckon with its plain language: that definition only applies "when a bail bond is executed by an accommodation bondsman." *Id.* § 15A-531(8)(c). Darlene argues neither that *she* executed the January bonds as a purported accommodation bondsman, nor that West—who *did* execute the January bonds—acted as an accommodation bondsman. Thus, we find this alternative argument similarly unpersuasive.

We conclude that Defendants did not act lawfully, either as sureties or as accommodation bondsmen. Accordingly, we overrule Defendants' issues brought on this basis.

### *Conclusion*

Each Defendant failed to preserve an argument now raised on appeal: (1) Darlene and Little Marc failed to preserve their challenges to the sufficiency of the evidence to support the charges of acting as an unlicensed bondsman or runner, and (2) Big Marc failed to preserve his challenge to the admission of the second 911 call. Defendants have waived appellate review of those issues, and we dismiss those portions of Defendants' appeals.

As regards Defendants' other arguments on appeal, we conclude that Defendants received a fair trial, free from prejudicial error.

NO ERROR.

Chief Judge McGEE and Judge ARROWOOD concur.